Seifing Unemployment Compensation Case.

Argued October 22, 1945. Before BALDRIGE, P. J., RHODES, HIRT, RENO, DITHRICH, ROSS and ARNOLD, JJ.

*Albert Smith Faught,* for employer, appellant.

*R. Carlyle Fee,* Assistant Special Deputy Attorney General, with him *Charles R. Davis,* Special Deputy Attorney General, and *James H. Duff,* Attorney General, for Unemployment Compensation Board of Review, appellee.

*Frank B. Murdoch,* with him *George M. Neil* and *Bell, Murdoch, Paxson & Dilworth,* for claimant, intervening appellee.

*Edward Paul Smith,* for General Building Contractors Association, under Rule 61.

OPINION BY RENO, J., April 23, 1946:

Claimant, John Seifing, had been employed by appellant, Barclay White Company, in Philadelphia, as a carpenter, for five weeks ending January 21, 1944. His work in building forms for concrete construction was then completed and he was laid off for lack of other carpenter work for this employer. He registered for work and, subject to two waiting weeks, filed claims for unemployment compensation for the week ending February 20, 1944, and for the three weeks following. He was paid for the first week only. Further compensation was denied by the bureau on the ground that claimant had refused to accept suitable work offered to him.

On February 21, 1944, claimant had been referred to the Sun Ship Company at Chester for employment as a ship's carpenter. He had been a member of a carpenter's union for many years. The Sun Company was not a union shop and paid only $1.01½ to $1.20 per hour as against $1.58 which claimant had been receiving under the wage scale established by his union. In refusing to accept the referral to the Sun Company for employment, claimant indicated that he was unwilling to work for less than his union rate but rested his claim for compensation on the assertion that if he accepted the assignment he would have been suspended from his union with consequent loss of all membership advantages including sick, old age and death benefits. On appeal the referee sustained the order of the bureau, denying compensation. The board reversed the referee, and in its final order declared claimant entitled to compensation subsequent to February 21, 1944, as claimed. The question is whether claimant refused to accept *suitable work* without *good cause* within the intent of §402 (a) of the Unemployment Compensation Law of December 5, 1936, P. L. (1937) 2897, as amended, May 21, 1943, P. L. 337, 43 PS §802,[1] and §4 (r), as amended,

---

[1] An employe shall be ineligible for compensation or waiting period credit for any week—(a) In which his unemployment is due

May 27, 1943, P. L. 717, 43 PS §753.[2]

The Sun Company was engaged in ship building contracts with agencies of the United States government, in the then war emergency, with an insufficient supply of labor to perform them. No claim is made that the rate of pay was not adequate for the kind of service demanded, or that the hours or other conditions of the work were less favorable to claimant than those prevailing in the locality for similar work. The position offered was not vacant because of any labor dispute at the Sun shipyards. No condition was attached, requiring claimant to join a company union or to resign from the union of which he was a member. Claimant was qualified, by prior experience as a carpenter, to do the work without risk to his health or safety, and the distance between his home and the shipyard at Chester was less than that traveled in his former employment, with a saving in traveling time. The referred work was suitable within the meaning of §4 (r). The decisive question is whether claimant refused it "without good cause".

I. Upon that basic question the board found: "Had claimant accepted the proffered employment he would

---

to failure, without good cause, either to apply for suitable work at such time and in such manner as the department may prescribe, or to accept suitable work when offered to him by the employment office or by his previous employer. In determining whether or not any work is suitable for an individual, the department shall consider the degree of risk involved to his health, safety and morals, his physical fitness and prior training and experience, and the distance of the available work from his residence.

2 "Suitable Work" means all work which the employe is capable of performing, except work in which—(1) the position offered is vacant, due directly to a strike, lockout, or other labor dispute, or (2) the remuneration, hours or other conditions of the work offered are substantially less favorable to the employe than those prevailing for similar work in the locality, or (3) as a condition of being employed, the employe would be required to join a company union, or to resign from, or refrain from joining, any bona fide labor organization.

have subjected himself to expulsion from the union of which he was a member and would have lost accumulated death benefits." The board's findings of fact, if supported by the evidence, are conclusive. Id. §510, 43 PS §830.

The uncontradicted testimony is that claimant had been a member of the United Brotherhood of Carpenters and Joiners of America, an affiliate of the American Federation of Labor, for over thirty years, and that it maintained a death benefit fund and an old men's home. The claimant testified to those facts; and that his union had a regulation under which members who took non-union jobs were suspended; that members of his union had been suspended in the past for violations of that rule; that the union has a closed shop in Philadelphia; that the Sun Ship Company did not have a union shop covered by his union; that the minimum rate of his union was $1.58 per hour; and that the secretary-treasurer of his union had informed him that he would be suspended from the union if he accepted the Sun Ship referral.

By stipulation, an affidavit of the secretary-treasurer of the union was filed with the referee, and therein he swore: "He [the secretary-treasurer] says that he told Mr. Seifing [claimant] that if he accepted such employment [Sun Ship Company], he would have to resign from the Union or be suspended for violating By-Laws and Working Rules of the Metropolitan District Council, Philadelphia and Vicinity of the United Brotherhood of Carpenters and Joiners of America."

The rules are lengthy, and need not be quoted verbatim. The pivotal and most important provision is contained in Rule 2: "The minimum rate of wages per hour shall be the prevailing rate established by the District Council, through referendum vote by the members of the District. . . ." *No penalty is contained in this rule.* Rule 13 prohibits members from working with "a non-union man more than one day without reporting same to the Business Agent or Secretary-Treasurer, under pen-

alty of Five Dollars . . ." Rule 26 provides: "When a member goes on a job, he must ascertain whether it is a Union job. If the job is not a Union job and he works on same, he shall be fined not less than Ten Dollars . . ." Rule 15 provides: "Any member violating any of these rules *where the penalty is not expressly provided* shall be liable, after due trial and conviction, to a fine, suspension or expulsion, as the District Council may determine." (Italics supplied). Since no penalty is expressly provided for a violation of Rule 2, the punishment which may be inflicted for its infringement is a fine, suspension or expulsion.

It cannot be doubted that for a violation of Rule 2 the penalty usually and ordinarily imposed is suspension or expulsion. The claimant and the union official have so testified, and the claimant further testified that the union has in fact suspended members for that offense. The testimony fortifies a matter upon which the public has ample and corroborative information. The power to punish members who work for less than the prevailing union rate, or who work with nonunion workmen, if it is not the veritable sine qua non of the labor movement, at least lies very near to its heart, and is of its very essence. It is the keystone of labor's organic legal structure, the efficacious implement by which a union achieves unity, so essential to the attainment of its objectives. Without it, a union would be a pallid, impotent entity, its by-laws mere fustian, and its objectives unrealizable. To be effective, the by-laws must be more than mere written threats, they must be enforced impartially and judiciously. And by the weight of authority, including *Coppage v. Kansas,* 236 U. S. 1, 35 S. Ct. 240, a rule of a labor union forbidding its members to work with nonunion men or with members of a rival organization is valid.[3] 31 Am. Jur., Labor, §45.

---

[3] In *Weiss v. The Musical Mutual Protective Union,* 189 Pa. 446, 451, 42 A. 118, the Supreme Court affirmed per curiam the opinion of the court below which held that even in the absence of a by-law pro-

We hold that the board's findings of fact are sustained by the evidence.

II. We do not understand that appellant seriously contends that the record does not support the finding. Its argument really is that the finding is based upon evidence which should not have been received or relied upon. For example, because the union rules offered in evidence do not contain a reference to death benefits, appellant argues that that portion of the finding is unsupported by evidence.

But it is sustained by claimant's testimony, and it is no answer to suggest that his testimony was hearsay. The act authorizes the board to prescribe rules of procedure "whether or not such rules conform to common law or statutory rules of evidence and other technical rules of procedure." Id. §505, 43 PS §825. A rule (No. 303) of the board adopted September 30, 1942, provides: "Observance of common law and statutory rules of evidence and technical and formal rules of procedure shall not be required." And in a comparable area of the law this court and the Supreme Court have held that hearsay testimony taken without objection is properly upon the record, and affords a basis for judgment. *Poluski v. Glen Alden Coal Co.*, 286 Pa. 473, 133 A. 819; *Nesbit v. Vandervort & Curry*, 128 Pa. Superior Ct. 58, 193 A. 393.

Claimant's testimony was not the best evidence. The entire constitution and all the by-laws should have been introduced into evidence. Doubtless they would have revealed a provision for a death benefit fund. But in the absence of an objection lodged before the referee or the board, we cannot now consider the question. It is an elementary rule of practice that appellate courts will review only those questions which are properly and timely raised before the court below or the administrative tribunal. Although it had notice, the employer did not appear at the referee's hearing, and the record

---

viding for expulsion of members, a union may expel a member who "has done some act tending to the destruction of the society."

does not clearly disclose that it appeared at the hearing of the board. Had appellant been able to contradict claimant's testimony, or any other testimony, it should have applied to the board for leave to introduce additional testimony, and such testimony would have been received and considered by the board. Id. §504, 43 PS §824. Upon proper application, the board might have granted a rehearing. At all events, appellant will not be permitted to raise for the first time on appeal questions relating to the quality of the proof.

III. Appellant's principal contention is that claimant was "without good cause" in refusing the referred employment. We have enumerated the elements which compose "good cause" in another context, *Sturdevant Unemployment Compensation Case,* 158 Pa. Superior Ct. 548, 45 A. 2d 898, and what we there said is applicable to this case. The problem here, as there, is whether there were extraneous factors, outside pressures, necessitous circumstances, and legal obligations of sufficient force and character to compel and justify the decision to refuse the referred employment.

The case comes to this: The claimant was obliged to decide between the referred employment and the loss of his union membership. Is an unemployed workman obliged to accept suitable employment when its acceptance subjects him to the loss of membership in an organization which is sanctioned and encouraged by the law, and thereby sacrifice valuable property rights? Is an employe who refuses referred suitable work in such circumstances "without good cause"?

Unions are now under the protection of the police power of the Commonwealth, and the legislature has solemnly declared that "the public policy of the State [is] to encourage the practice and procedure of collective bargaining and *to protect the exercise by workers of full freedom of association,* self-organization, and designation of representatives of their own choosing, for the purpose of negotiating the terms and conditions

of their employment or other mutual aid or protection, free from the interference, restraint or coercion of their employers." (Italics supplied). Pennsylvania Labor Relations Act of June 1, 1937, P. L. 1168, §2 (c), 43 PS §211.2. Succeeding sections of the act implement the declaration of policy, and the act is constitutional. *United Retail Employees of Am. v. W. T. Grant Co.*, 341 Pa. 70, 17 A. 2d 614. A similar declaration is made in the Labor Anti-Injunction Act of June 2, 1937, P. L. 1198, §2 (a), 43 PS §206 b. It is thus the settled policy of the State to encourage unions, to throw around them the protection of law, and the maintenance of their membership has become a matter of direct concern to the public welfare. The law now sustains labor unions not alone because of the inestimable advantages which they bring to their members, but for the larger purpose they serve, of promoting the public welfare. So an employe who joins a union and abides by its internal polity is within his legal rights; and he acquires a status for the preservation of which the police power of the State is pledged.

Before the General Assembly definitely declared the policy of the State, the Supreme Court held that membership in unions constitutes property. The bundle of rights which membership in a union confers upon its members—among them, the privilege of engaging in collective bargaining, the interest in sick and death benefits, and the opportunity to obtain and retain work within the member's trade at union rates—is property, so valuable and so thoroughly established in law that equity will restrain its impairment. *Heasley v. Operative Plasterers & Cement Finishers International Association*, 324 Pa. 257, 188 A. 206. The member however holds title to this property upon the express condition that he comply with the duties and obligations imposed upon him by the constitution, by-laws and the properly adopted rules of the union, and he loses it by his failure to meet the conditions of membership. Equity will not intervene to save for him the property he has forfeited

by his failure to comply with them. *Brown v. Lehman,* 141 Pa. Superior Ct. 467, 15 A. 2d 513. The loss of union status and its attendant consequences is a substantial and an irreparable harm, so declared by our Supreme Court apart from, and before the enactment of, the Unemployment Compensation Law.

Thus we have before us all the factors which we said in the *Sturdevant* case, supra, constitute "good cause", and transform what is ostensibly voluntary unemployment into involuntary unemployment. We have "the pressure of real not imaginary, substantial not trifling, reasonable not whimsical, circumstances," and these compelled claimant's decision to refuse the referred employment. The threat of expulsion was real not imaginary: it was contained in the by-laws; it was communicated by a responsible union official to the claimant; and other members had been suspended or expelled for the same cause. It was substantial not trifling: loss of membership in the union would deprive claimant of valuable property rights, the accumulated death benefits, and the opportunity to obtain and retain work at union rates. It was reasonable not whimsical: Rule 2 is enforceable as a reasonable and lawful regulation. Claimant's refusal contains all the elements of good cause.[4]

Accordingly, we affirm the board's decision, and hold that where a union employe in good faith predicates his refusal to accept referred employment upon a union by-law which prescribes suspension or expulsion for its violation, a by-law consistently enforced by the union, and which the union actually threatens to enforce against him, he is justified by a "good cause" in refusing the employment.

---

[4] According to the record, claimant's benefits, if he remained unemployed for the maximum benefit period, would be $270, i.e., $18 a week for 15 weeks. Had he accepted the referred employment, and been paid only the minimum wages of $1.01½ per hour on a 40 hour week basis, he would have earned $609 during that period. That sum, less whatever compensation may be allowed to him as a result of this decision, represents the loss suffered by him to maintain his union status.

We are not called upon to decide whether a fine also qualifies as "good cause". Depending upon the amount, and other factors, it may be a trifling circumstance, in line with the *Sturdevant* decision. Nor do we draw a distinction between a suspension and an expulsion. The board regarded them as synonymous, as they probably are in union nomenclature, and in any event they are both harmful to the employe.

IV. Finally, appellant contends that this construction of the act renders the act unconstitutional because thereby the unemployed are classified into two groups, the union and the nonunion.

Appellant is claimant's last, but not his base-year, employer,[5] and, since its contribution rate will not be injuriously affected by the decision, it has no standing to raise the constitutional question. *Turco Paint & Varnish Co. v. Kalodner,* 320 Pa. 421, 184 A. 37; *Plymouth Coal Co. v. Pennsylvania,* 232 U. S. 531, 34 S. Ct. 359; *Com. v. Evans,* 156 Pa. Superior Ct. 321, 40 A. 2d 137. Nevertheless we shall consider the question as though it was regularly before us.

The contention arises from a misconception of the basis and effect of the decision. Neither the board nor this court has classified employes. We decide only that employes may in certain circumstances refuse referred employment, and that the circumstances of each case

---

[5] The distinction is thoroughly explained in the brief of counsel for the board: "A last employer of a claimant at a time a claim for compensation is filed may not be an employer who paid wages in covered employment to a claimant in his (claimant's) base year. In such a case the last employer's contribution liability could not be affected by the payment of contribution to such claimant. Since the claimant in the present appeal filed his claim for compensation on January 31, 1944, his benefit year was the period from June 1, 1943 to May 31, 1944 (§4 [b]) and his base year was the calendar year 1942 (§4 [a]). Since he had no employment with the appellant in his base year ('his employment with appellant extended for about five weeks prior to January 21, 1944) appellant's contribution liability could not be affected by claimant's receipt of compensation on the present claim. See §301 (b) (2) and (4)."

must be examined to determine whether there was "good cause" for the refusal. Today we have decided that a union employe confronted by a certain set of circumstances, may refuse employment. Tomorrow we may hold that a union member in the presence of less compelling although similar circumstances may not refuse employment. And the following day, we may adjudicate the claim of a nonunion employe caught in the mesh of circumstances to which he was compelled to surrender, and we shall apply impartially the same principles of law. Always we predicate our conclusion upon the legislative intent which we have discovered in the whole act and, particularly, in the phrase, "without good cause". A few weeks ago, considering "without good cause" in another section of the act, we held that a married woman who voluntarily left her employment to join her husband had good cause, while a single woman who left her employment to marry her fiance did not have a good cause. *Sturdevant Unemployment Compensation Case*, supra; *Dames Unemployment Compensation Case*, 158 Pa. Superior Ct. 564, 45 A. 2d 909. Shall it be said, can it be said that thereby we unconstitutionally classified employes upon the basis of their marital status? When it is decided, as it has been by administrative agencies, that persons of certain religious affiliations are not obliged to accept employment requiring Sunday work, are workers thereby unconstitutionally classified in religious and nonreligious groups?

It is not unlikely that we shall be obliged to pass upon the same questions which have had the attention of tribunals elsewhere: e.g., whether an employe is justified in refusing work involving risks to his health, safety or morals; work requiring absence from home during certain hours of the day; work obliging the employe to travel unreasonable distances; and similar questions. If decisions of these questions, and the innumerable other factual situations which may arise under the act, are based upon the attendant circumstances, and upon

the controlling principles enacted into law by the statute, so that in one instance we find legal justification for the refusal and in another lack of it, is the discovery of the differences a judicial classification, and unconstitutional because arbitrary and not based upon real distinctions?

The short and conclusive answer to the contention is that courts and administrative agencies do not classify, they merely discover the presence or absence of "good cause into separate categories. This is not the exercise in any sense be called classification, the classification consists in allocating those with and those without good cause into separate categories. This is not the exercise of legislative or judicial power which offends constitutional principles. Nothing in the Federal or the Pennsylvania Constitution forbids the allowance or withholding of unemployment compensation upon the basis of good cause.[6] See *Chamberlin v. Andrews,* 271 N. Y. 1, 2 N. E. 2d 22, affirmed, 299 U. S. 515, 57 S. Ct. 122; *Steward Machine Co. v. Davis,* 301 U. S. 548, 57 S. Ct. 883; *Carmichael v. Southern Coal & Coke Co.,* 301 U. S. 495, 57 S. Ct. 868.

Decision affirmed.

---

DISSENTING OPINION BY HIRT, J., May 4, 1946:

The Workmen's Unemployment Compensation Act (a past-due approach to the social aspects of involuntary unemployment) admittedly is experimental in a new field. For want of a background of experience we may not be too critical of the Board in the administrative procedures and policies adopted by it in giving effect to the broad purpose of the act. In this instance,

---

[6] For luminous discussions of many phases of, and problems arising from, the unemployment compensation statutes, see 55 Yale Law Review 1 et seq. The entire number (265 pages) is devoted to that topic, and the writer of this opinion believes it is the best available expository treatise upon the texts of the acts of the various states. Although the number is dated December, 1945, it was not published until after the *Sturdevant* and cognate cases, supra, had been decided.

however, I think that the order, affirmed by the majority, is not supported by the evidence; that it violates the clear intent of the act and that constitutional limitations stand in the way of reading into this legislation implied authority necessary to support the action of the Board.

To be specific, I am unable to find in this record any sufficient evidence that claimant would have been suspended from his union by accepting the referred employment. There is no testimony other than the statement of an officer of the union that he told claimant that suspension would follow. His affidavit, admitted in evidence by stipulation, does not claim authority to speak for the union other than through its rules or by-laws and I cannot find anything definite in these rules that would bring about a suspension of a member for working for wages below the established union scale, under the facts of this case. Whether that penalty would be imposed, in any event, under the general language of Rule 15, would lodge in the discretion of the District Council of the union.

But even if the union had the power of suspension or expulsion, that, in my opinion, would not constitute "good cause" for claimant's refusal of the referred employment, under the act. What is good cause is to be determined in each case on its own facts. But without definition, *good cause* is restricted in its meaning by the dominant intent of the act. Section 3 contains a declaration of "public policy" which is not a mere preamble to the statute, but a constituent part of the act to be considered in construing or interpreting every part of it. *Dept. L. & I. v. Unemplymnt. Comp. Bd.*, 148 Pa. Superior Ct. 246, 24 A. 2d 667. A good cause which offends against public policy, so declared, is not a good cause. I am convinced that claimant's excuse for not accepting the referred work, even if he made himself liable thereby to expulsion from his union, is within that class. This is a statute enacted for the common

good in an attempt to provide economic security for a time, through referred jobs in productive industry for the unemployed, without the stigma of poor relief, as a substitute for the dole or made-work. Its purpose is to prevent indigence due to involuntary unemployment through no fault of the employee. And while the legislature indicated a sympathetic and proper respect for labor organizations, the purpose of the act was not to further their objectives as such. The act stands impartial between organized labor and industry, in the evolution of their relations one with the other, with a studied policy of non-interference except in definite provisions which insure the right of a workman to maintain his membership in the union of his choice. What the act prohibits is a condition attached to referred employment that a workman join a company union or resign from or refrain from joining any other labor organization. The prohibitions, by implication, relate to conditions imposed by the new employer or by the referring agency. But though not limited to them (Cf. *Sturdevant Unemployment Comp. Case,* 158 Pa. Superior Ct. 548, 45 A. 2d 898) it is clear that the exceptions cannot be extended to apply to a workman who may lose his existing membership under a union by-law merely because of temporary work in a non-union shop while employment in a union shop of his affiliation is not available. To hold otherwise is the equivalent of saying that a union may adopt its own definition of suitable work and determine, by rule and by-law, what does and what does not constitute *good cause* for refusing referred employment. The legislature has not delegated such authority and is without power to do so. *Locke's Appeal,* 72 Pa. 491.

We are concerned with an administrative policy of the Board based upon its construction of the act. Regardless of whether the employer in this case has standing to raise constitutional questions, I agree with the majority that they should be considered. In my view

there is another fundamental objection to the interpretation of the act adopted by the majority. Claimant in this case was held to have had good cause in refusing the referred employment at wages below the union scale because of the anticipated adverse effect of a union by-law to which he was subject. Under similar circumstances a non-union workman would be barred from compensation by his refusal to accept the referred work, otherwise suitable, on the ground that the wages offered were below the scale of his former employment. It is futile therefore to argue that the Board in administering the act—with the sanction of the majority— has not placed union members in one class and non-union workmen in another. Any such administrative classification under which a member of a union may refuse suitable referred employment (unless within specific exemptions of the act) but which a non-union workman is bound to accept, is unconstitutional in my opinion. It is unreasonable in that it creates a preference in favor of members of one group not generally applicable to all workmen.

Finally, I should like to make it clear that I would readily concur in the result reached by the majority if the testimony were sufficient to support a finding that the wages offered this claimant were less favorable than those "prevailing for similar work in the locality". The act contemplates a give-and-take attitude in periods of unemployment, but, it certainly cannot be used as an instrument for depressing wages.

Instead of adhering to a defensible interpretation of what is suitable work, the Board, with the approval of the majority, has adopted a basis for its decision for which I can find no legal justification under the act. To that I must dissent. The ruling is of no great importance in the present transient phase of industrial readjustment; it is bound to become so in future periods of prolonged or general unemployment.

BALDRIGE, P. J., joins in this dissent.