Northampton Area Joint School Authority *v.* Building and Construction Trades Council of Allentown, Bethlehem and Easton, Appellant.

Argued January 5, 1959; reargued April 24, 1959.

Before JONES, C.J., BELL, MUSMANNO, JONES, COHEN, BOK and MCBRIDE, JJ.

*Philip J. Gahagan,* for appellants.

*Bruce E. Cooper,* with him *Jerome W. Burkepile, Jr.,* and *Rhoads, Sinon and Reader,* for appellees.

OPINION BY MR. JUSTICE BENJAMIN R. JONES, June 30, 1959:

This is an appeal from the grant of a preliminary injunction by the Court of Common Pleas of Northampton County, sitting in equity.

Seven school districts in Northampton County (one third class district and six fourth class districts) joined in the formation of a joint school district called the "Northampton Area Joint School District". Due to an increase in school enrollment the public schools in the area have become seriously overcrowded and approximately 2,000 children are affected by these overcrowded school conditions. For the purpose of building a new high school to alleviate this situation, on August 23, 1956 the seven school districts and a joint school district comprising all seven school districts (herein called joint district) formed a municipal authority, known as the Northampton Area Joint School Authority (herein called Authority). This Authority, acting in compliance with the Municipal Authorities

Act of 1945,[1] duly advertised for bids for the construction of a new high school. After the bids were received, opened and considered, on January 28, 1958 contracts in connection with the proposed high school construction were awarded as follows: Luria Engineering Co. (herein called Luria) the general contract; John F. Miles (herein called Miles) the heating contract; George F. DeLallo (herein called DeLallo) the plumbing contract; William A. Donmoyer Co. (herein called Donmoyer) the electrical contract. Luria, Miles and DeLallo were so-called "union contractors" in that they employed only union labor, while Donmoyer was a so-called "non-union contractor" in that he employed no union labor.[2]

The work of construction began on or about March 15, 1958 and from that time until August 25, 1958 the general contractor, the plumbing contractor and the heating contractor were all working on the project. Donmoyer did not begin his work until August 25, 1958 and his employees worked on the project from August 25 to August 29, inclusive, 1958. On September 2, 1958, Local 375 of the International Brotherhood of Electrical Workers (herein called Union) and the Buildings & Construction Trades Council of Allentown, Bethlehem and Easton,[3] (herein called Trades

---

[1] Act of May 2, 1945, P. L. 382, §10, 53 PS §312, which reads in part: "All construction . . . of any nature made by any Authority, where the entire cost, value or amount of such construction . . . shall exceed five hundred dollars ($500.00) [with certain exceptions not herein pertinent] shall be done only under contract or contracts to be entered into by the Authority with the lowest responsible bidder, upon proper terms, after due public notice has been given, asking for competitive bids . . ."

[2] On this job Luria had forty men, Miles had three men, DeLallo had five men and Donmoyer had three men.

[3] An unincorporated labor union composed of representatives and delegates of a number of local trade unions, including the Union.

Council) began picketing the construction site, with sometimes one and at other times two pickets.[4] The result was that the employees of Luria, DeLallo and Miles—all members of unions but not of the Union herein involved—refused to cross the picket lines and the work of construction of this high school ceased.

After the construction work had been at a standstill for approximately two months, the seven school districts, the joint district and the Authority, together with Donmoyer, filed a complaint in equity against the Union, the Trades Council, Harry B. Parks (the Union's Business Agent and President of the Trades Council) and one Louis Greenberg, the only identified picket. A preliminary injunction was sought and the court below granted a rule to show cause why a preliminary injunction should not issue, said rule being made returnable before Judge C. B. Palmer.

The defendants filed both an answer and preliminary objections to the complaint.

A hearing was held at which the plaintiffs presented evidence but the defendants, although they had full opportunity to do so, presented no evidence. After this preliminary hearing, the court below dismissed defendants' preliminary objections and, preliminarily, enjoined and restrained all four defendants "from doing any act calculated or intended to compel [Donmoyer] to require its employees to become members of either [the Union] or [the Trades Council] by picketing the school building site . . ., or, in furtherance of such purpose, conspiring, combining, agreeing, or arranging with any person or persons, with each other, with any organizations, associations, or trade unions to induce, coerce or intimidate any person or persons who have in the past or who are presently working on the

---

[4] There is no allegation that the picketing was other than peaceful.

[school] project from working on said project or from entering the premises thereof, or, in furtherance of said purpose, interfering with the construction of said school building by [Luria], [DeLallo], [Miles], [Donmoyer], or any of their sub-contractors."

The court below found, inter alia: (1) on December 18, 1957, after the receipt of sealed bids but before the award of any contracts, one Mr. Toman (an agent for a union not herein involved and vice-president of District 2, Pennsylvania State Building Trades) appeared at a meeting of the Authority, and stated that he represented the trade unions, that he hoped the contract would be awarded to union contractors, and either stated or intimated that "there might be trouble if the union wasn't satisfied"; (2) in the middle of February, 1958, after the contracts had been awarded, two representatives of Luria attended a conference in the Trades Council office in Allentown, at which Parks and Toman were present and Parks then stated that there would possibly be trouble if the electrical workers went to work and that there would probably be a picket line; (3) that there exists no strike, lockout or labor dispute between the Authority, the joint district, Luria, DeLallo, Miles, Donmoyer and their respective employees; (4) since January 28, 1958 to the time of hearing none of Donmoyer's employees were invited or asked to join any union; (5) that the purpose of the picketing was to coerce Donmoyer "to become union-shop in order thereby to compel its employees to join [the Union] or lose their jobs"; (6) that approximately 2,000 school children in the district were presently affected by the overcrowded conditions therein; (7) at the time of hearing damages to the school building (approximately 18% completed) as the result of the work stoppage amounted to $3,000 to $5,000 with possible other extensive damages to fol-

low; (8) that the controversy was not a labor dispute under the Labor Anti-Injunction Act.

If the purpose of the picketing was the coercion of the employer Donmoyer into the formation of a union shop, such purpose was unlawful and the picketing was properly enjoined: *Anchorage, Inc. v. Local 301, A. F. of L.*, 383 Pa. 547, 119 A. 2d 199. To demonstrate that the purpose of the picketing was coercive it is not necessary for the record to disclose a *direct* demand by the Union upon the employer for a union shop. The purpose of picketing may be shown either expressly or by implication; to hold otherwise would constitute a failure to face the realities of the present factual picture. See: *Anchorage, Inc. v. Local 301, A. F. of L.*, 383 Pa. 547, supra; *Baderak v. Building and Construction Trades Council*, 380 Pa. 477, 112 A. 2d 170.

The Union and the Trades Council, even without directly contacting the employer, made it abundantly clear, as found by the court below, that a picket line with the direct result of preventing the employees of the other contractors from crossing the picket line and continuing their work, would be utilized if a *single* non-union contractor was hired. Although appellants urge that the purpose of the picketing was not coercive, but organizational, not a single one of the three employees of Donmoyer during the entire period was ever personally approached, contacted, or requested, either directly or indirectly, by the Union or the Trades Council to join any union. The known effect of the picket line combined with veiled, but nevertheless real, threats of its utilization on the premises of the school district, without even a token attempt on the part of the Union to personally contact or approach the employees it was purportedly seeking to organize, convincingly and clearly reveals that the purpose of the instant picketing was to coerce the employer Don-

moyer into the formation of a union shop, a purpose which our prior decisions declare unlawful and as constituting conduct which is properly enjoinable.

We have long and strictly adhered to the rule clearly set forth in *Lindenfelser v. Lindenfelser*, 385 Pa. 342, 343, 123 A. 2d 626: "Our uniform rule is that, on an appeal from a decree which refuses, grants or continues a preliminary injunction, we will look only to see if there were any apparently reasonable grounds for the action of the court below, and we will not further consider the merits of the case or pass upon the reasons for or against such action, unless it is plain that no such grounds existed or that the rules of law relied on are palpably wrong or clearly inapplicable: . . ." See also: *Philadelphia v. Philadelphia Transportation Co.*, 386 Pa. 231, 236, 126 A. 2d 132, and cases therein cited; *Riverside Borough School District v. International Brotherhood of Electrical Workers, Local 607*, 389 Pa. 637, 638, 133 A. 2d 554; *Williams v. Bridy*, 391 Pa. 1, 3, 136 A. 2d 832; *Parker v. Philadelphia*, 391 Pa. 242, 247, 137 A. 2d 343; *Penna. Turnpike Commission v. Evans*, 392 Pa. 110, 116, 139 A. 2d 530; *Summit Township v. Fennell*, 392 Pa. 313, 314, 140 A. 2d 789; *Herman v. Dixon*, 393 Pa. 33, 36, 141 A. 2d 576; *McDonald v. Noga*, 393 Pa. 309, 311, 141 A. 2d 842.

Acting within the scope of such appellate review, we have examined the record and find that the record discloses reasonable grounds for the action of the court below. The rules of law relied upon by the court below in support of its action are neither palpably wrong nor clearly inapplicable as the opinion of Judge Palmer in the court below readily reveals.[5]

---

[5] See: *West Penn Township School District v. International Brotherhood of Electrical Workers, Local Union 686*, 396 Pa. 408, 145 A. 2d 258.

In affirming the order of the court below, we are not unmindful of two recent United States Supreme Court decisions which could conceivably prohibit this Court and the court below from exercising any jurisdiction in the instant proceedings. See: *San Diego Building Trades Council, Millmen's Union, Local 2020, Building Material and Dump Drivers, Local 36 v. Garmon*, 359 U. S. 236; *Plumbers, Steamfitters, Refrigeration, Petroleum Fitters and Apprentices of Local 298, A. F. of L. v. County of Door*, 359 U. S. 354. The impetus of these decisions is felt, however, only where the effect on interstate commerce is sufficient to confer jurisdiction on the National Labor Relations Board. As this Court stated in *Haefele v. Davis*, 373 Pa. 34, 41-42, 95 A. 2d 195: "The question of federal jurisdiction in labor disputes arises only when employer is engaged in interstate commerce or when his business substantially affects interstate commerce: [citing cases]. The record in this case, as compiled in the court below, does not clearly disclose the extent or even the existence of interstate commerce engaged in or affected by the operation of Vulcan Iron Works. In order to oust this Court of jurisdiction . . . appellants had the burden of establishing facts which would show the interstate character of the business involved." Evidence of the National Labor Relations Board's jurisdiction must be either readily ascertainable from the complaint itself or affirmatively proven by the defendant. See: *Fountain Hill Underwear Mills v. A. C. W. U. of A.*, 393 Pa. 385, 143 A. 2d 354; *Elisco v. Rockwell Manufacturing Company*, 387 Pa. 274, 128 A. 2d 32. The record in the present case discloses no such evidence.

Order affirmed. Costs to abide the event.

Mr. Justice Musmanno dissents.

Dissenting Opinion by Mr. Justice McBride:

The majority opinion upholds a preliminary injunction which enjoins defendants and their agents (a) from picketing or doing any other act calculated or intended to compel an employer to require its employees to become members of a union; and (b) from conspiring with other persons to effectuate that purpose or that of interfering with the erection of the school building.

This injunction must not be permitted to stand if (1) under the evidence the court's jurisdiction is withdrawn by the Labor Anti-Injunction Act, or, (2) exclusive jurisdiction of the controversy has been given by Congress to the National Labor Relations Board. It is because I believe that at least one of these conditions is necessarily present in this case that I am constrained to dissent.

It is conceded that the picketing was peaceful[1] and that the legend carried by the pickets was true.[2] This fact, while not controlling, certainly increases the burden on plaintiffs to prove conduct that is enjoinable. Nevertheless, the court below held that such picketing was enjoinable because (1) after the bids had been received and opened but before the contracts were awarded, one Toman, business agent for Bricklayers Local 15 of Allentown, Pennsylvania, (a union in no way involved in this dispute) who is also Vice-President of District 2 of Pennsylvania State Building Trades, (not a defendant in this suit) informed a meeting of the Southampton Area Joint School Authority that he represented the trade unions; that he hoped the contracts would be awarded to union contractors; and, as the

---

[1] Finding No. 31 is that "The picketing was conducted in a peaceful manner without any violence or threats."

[2] This legend read "Electricians on this job are not members of Local 375, International Brotherhood of Electrical Workers."

court below found, "either stated or intimated that 'there might be trouble if the union wasn't satisfied'"; (2) Parks, who is a defendant and is a business agent of the defendant union, together with Toman, advised the general contractor, Luria Engineering Company (not a party hereto) that if the Donmoyer Company, a non-union contractor, was awarded the electrical contract there would probably be trouble and there would probably be a picket line when that contracting company commenced working. From these facts the court below has concluded that the purpose of the union was to compel the Donmoyer Company to coerce its employees to join the union.

I do not believe that inference can be drawn from those facts. A mere prediction that there would be trouble, or that there would be a picket line when the non-union men would commence working, is not sufficient to warrant the conclusion that the purpose was to coerce Donmoyer to do anything. No direct or indirect demand was made upon Donmoyer to put his men into the union nor was any direct or indirect demand made upon the employees of Donmoyer to join the union. The only legitimate inference that can be drawn from the evidence is that the union men objected to working along with non-union men; that they believed that they had an interest in the wages and working conditions of both union and non-union men since they were both engaged in the same trade or occupation; and hence were entitled to picket and to attempt to persuade all other union men to refuse to work with the non-union men and thus protect their own economic status. It is immaterial and *damnum absque injuria* that such self-protection would exert economic pressure upon the employers, the Authority, or both. Such conduct does not become unlawful simply because no strike was ever called or because the work on which the em-

ployees were engaged was a public school building being constructed by a School Authority. Nor is it material that the court below found that there was no "labor dispute of any kind" between the Authority, the School District, the general contractor or any of the sub-contractors on the one hand and *their respective* employees on the other hand.

The fact is, as found by the court below, that the work on the high school building stopped because the employees of the other union contractors refused to cross the picket line. It is immaterial that the picketing was done with the knowledge or approval of Parks or of Toman or of anyone else.

In my view, the court below was in error in holding that under the facts of this case the controversy does not constitute a labor dispute within the meaning of that term as used in the Labor Anti-Injunction Act.[3]

A "labor dispute", as stated in §206c(a)(b)(c), exists where "the case involves persons who are engaged in a single industry, trade, craft or occupation, or have *direct or indirect* interests therein", *or* concerns "the association or representation of persons in negotiating, fixing, *maintaining,* changing, or seeking to arrange terms or conditions of employment or concerning employment relations or *any other controversy arising out of the respective interests of employer or employee*[4] . . ." (Emphasis supplied.)

---

[3] Act of June 2, 1937, P.L. 1198, as amended, 43 P.S. §206c.

[4] The exact language is as follows:

"(a)   A case shall be held to involve or to grow out of a labor dispute when the case involves persons who are engaged in a single industry, trade, craft or occupation, or have direct or indirect interests therein, or who are employes of the same employer, or who are members of the same or an affiliated organization of employers or employes, whether such dispute is (1) between one or more employers or associations of employers, and one or more employes or associations of employes; (2) between one or

It seems to me that this plain, unequivocal language, when applied to the facts of this case, requires us to hold that there was here involved a labor dispute within the coverage of the Labor Anti-Injunction Act. The Constitution and By-Laws of the union, which forbade its members to work with non-union men, is valid. *Coppage v. Kansas*, 236 U. S. 1. See also, *Barclay White Co. v. Unemployment Compensation Board of Review*, 159 Pa. Superior Ct. 94, 46 A. 2d 598, reversed on other grounds, 356 Pa. 43, 50 A. 2d 336. The Labor Anti-Injunction Act does not declare the acts as to which it prohibits the issuing of an injunction to be legal or illegal but merely denies that particular remedy in certain cases and restricts it in others. *Alliance Auto Service v. Cohen*, 341 Pa. 283, 19 A. 2d 152. Peaceful picketing for the purpose of persuading non-union

---

more employers or associations of employers, and one or more employers or associations of employers; or (3) between one or more employes or association of employes, and one or more employes or association of employes; or when the case involves any conflicting or competing interests in a 'labor dispute' (as hereinafter defined) of 'persons participating or interested' therein (as hereinafter defined.)

"(b) A person or association shall be held to be a person participating or interested in a labor dispute if relief is sought against him or it, and if he or it is engaged in the same industry, craft or occupation in which such dispute occurs or has a direct or indirect interest therein, or is a member, officer or agent of any association composed in whole, or in part, of employers or employes engaged in such industry, trade, craft or occupation.

"(c) The term 'labor dispute' includes any controversy concerning terms or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment or concerning employment relations or any other controversy arising out of the respective interests of employer and employe, regardless of whether or not the disputants stand in the proximate relation of employer and employe, and regardless of whether or not the employes are on strike with the employer."

employees to join the union is constitutionally protected and cannot be enjoined in the absence of force or coercion. *Sansom House Enterprises v. Waiters and Waitresses Union,* 382 Pa. 476, 115 A. 2d 746. It is only where the union attempts to reach the employees by coercing the employer that it becomes unlawful and therefore enjoinable. The majority points out there was no direct attempt to persuade either Donmoyer or its employees. How then can it be concluded that the purpose was to coerce Donmoyer and not the employees?

The majority treats the finding of the court below that there was no labor dispute as if it were a finding of fact, whereas it really is a question of law. But in any event, it is settled beyond controversy that peaceful picketing with no element of illegality is not enjoinable even if it is not a labor dispute. We so held in *Kirmse v. Adler,* 311 Pa. 78, 166 Atl. 566, even before the Labor Anti-Injunction Act was passed.

The majority says "The Union and the Trades Council, even without directly contacting the employer, made it abundantly clear, as found by the court below, that a picket line with the direct result of preventing the employees of the other contractors from crossing the picket line and continuing their work, would be utilized if a *single* non-union contractor was hired." There is nothing invalid or wrongful about such conduct. The Court has no power to enjoin conduct protected by the public policy of the Labor Anti-Injunction Act.[5] It is only necessary, under the public policy declaration of that Act, that the union or its membership has a direct or indirect interest in a "labor dispute" as defined therein and, as I have noted above, a "labor dispute"

---

[5] "No court of this Commonwealth shall have jurisdiction to issue any restraining order or temporary or permanent injunction . . . contrary to the public policy declared in this act. . . ." Act of June 2, 1937, P.L. 1198, §4, as amended, 43 P.S. §206d.

exists wherever union men have a direct or indirect interest in the employment of non-union men where they are competitively engaged in the same trade or occupation. In my view, therefore, the court below was without power under the evidence in this case to grant a preliminary injunction even though the injunction on its face enjoins conduct not protected by the Labor Anti-Injunction Act. This Court should not be niggardly in its interpretation of this act for the purpose of finding the case within the exceptions rather than within the coverage. In speaking of the rights of the individual workman the Act provides: ". . . wherefore, though he should be free to decline to associate with his fellows, it is necessary that he have full freedom of association, self-organization, and designation of representatives of his own choosing to negotiate the terms and conditions of his employment, and that he shall be free from the interference, restraint or coercion of employers of labor or their agents in the designation of such representatives or in self-organization or in other concerted activities for the purpose of collective bargaining or other mutual aid or protection."

It is important to note that although the public policy of the Commonwealth may be indifferent to wages and rates of pay in private contracts, it has a very definite policy as to contracts of the kind involved here. The Act of March 10, 1949, P. L. 30, art. VII, §752, 24 PS 7-752 provides as follows: "All contracts, hereafter awarded and entered into by any school district, shall contain a clause or stipulation requiring that no person shall be employed to do work under such contract except competent and first-class workmen and mechanics. No workmen shall be regarded as competent and first-class, within the meaning of this act, except those who are duly skilled in their respective branches of labor, and who shall be paid not less than

such rates of wages and for such hours' work as shall be the established and *current rates of wages paid for such hours by employers of organized labor* in doing of similar work in the district where work is being done." (Emphasis supplied.) This policy specifically binds a school district; it equally binds authorities, such as herein involved, which are created by one or more such school districts. These union men, therefore, have a direct interest in seeing to it that their own union employers are not put at a competitive disadvantage, thus threatening their own livelihood. The record is silent as to whether Donmoyer paid union scale. Presumably, therefore, the Union was acting lawfully since the plaintiffs, who had the burden of proof, did not produce evidence which would make this Act ineffective in the present case even apart from the Labor Anti-Injunction Act.

If I am wrong in all this, then it seems to me that the very holding of the court below, affirmed by the majority opinion, shows that no Pennsylvania court has jurisdiction in this case.

On April 20, 1959, the Supreme Court of the United States decided *San Diego Building Trade Councils v. Garmon et al.*, and on May 4, 1959, the same Court decided *Local 298 v. County of Door*. It is perfectly clear, under the *Garmon* case, that activities regulated by §§7 and 8 of the Labor Management Relations Act, 29 U.S.C.A. §§157-8, are not subject to regulation by any state administrative agency or equitable injunction in any state or federal court. Under the *Door* decision it does not matter whether the majority is right and I am wrong or vice versa. It was held to be equally immaterial that the state court might properly find there was an attempt to force the employer to sign a union shop agreement or that the case merely involved union workers who refuse to work with non-union workers.

When the *County of Door* case, *supra,* is considered in the light of the *Garmon* decision, both cases together stand unequivocally for the proposition that if it is "arguable" that the conduct of the union was either *protected*[6] by federal law or *condemned*[7] by it, state courts are without jurisdiction to decide the controversy but the matter must be settled by the National Labor Relations Board. Hence, in this case, assuming interstate commerce, the court below was without power to decide if plaintiff or defendant was right. *Weber v. Anheuser-Busch, Inc.,* 348 U. S. 468, 481. It seems to me that the *Door* case is on all fours with the present one, even accepting the findings of the court below. There, as here, a municipal corporation hired a general contractor who let out eight individual sub-contracts. Among the successful bidders for one of the sub-contracts was a non-union employer. This disturbed the union which attempted to induce him to sign a union agreement. When he refused the union peacefully

---

[6] Section 7 of the Labor-Management Relations Act reads: "Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection. . . ." 61 Stat. 140, 29 U.S.C. §157.

[7] Section 8(b)(4) of the Labor-Management Relations Act provides in part: "It shall be an unfair labor practice for a labor organization or its agents—to engage in, or to induce or encourage the employees of any employer to engage in . . . a strike . . where an object thereof is: (A) forcing or requiring . . . any employer or other person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person; (B) forcing or requiring any other employer to recognize or bargain with a labor organization as the representative of his employees unless such labor organization has been certified as the representative of such employees . . ." 61 Stat. 141, 29 U.S.C. §158(b)(4).

picketed and thereby effectively stopped all the work since union members employed by other contractors refused to cross the picket line.

It is true, as we stated in *Haefele v. Davis*, 373 Pa. 34, 95 A. 2d 195, that the question of federal jurisdiction in labor disputes arises only when the employer is engaged in interstate commerce or when his business substantially affects interstate commerce. I believe that the majority has reached a wrong result in concluding that the silence of the record in this case on the issue of interstate commerce justifies an affirmance of this preliminary injunction. These decisions of the Supreme Court of the United States were not filed until after the Chancellor had issued his preliminary injunction. Therefore, understandably, he didn't inquire into the issue of interstate commerce involving this tremendous building operation. It must be decided sooner or later in this case because it involves jurisdiction of the subject matter which may not be conferred by acquiescence of the parties who did not raise it. It is not enough to say that he may make that determination upon final hearing and *continue the injunction until that determination.* I believe the holdings in these cases require us to remand the matter to him to take testimony forthwith in the light of those cases and relevant principles governing what constitutes an effect upon interstate commerce. See *Penna. Labor Relations Board v. Friedberg*, 395 Pa. 294, 148 A. 2d 909, and cases cited therein. See also *Labor Board v. Denver Bldg. & Constr. Trades Council*, 341 U. S. 675, 683-4.

I would therefore reverse on the ground injunctive power was withdrawn from the court below by virtue of the Labor Anti-Injunction Act, or, at the very least, the case should be remanded for further consideration by the court below in the light of *Door* and *Garmon.*

Accordingly, I dissent.

Mr. Justice COHEN joins in this dissenting opinion.