Sansom House Enterprises, Inc., Appellant, *v.* Waiters & Waitresses Union, Local 301, AFL.

Argued April 20, 1955. Before STERN, C. J., STEARNE, JONES, BELL, CHIDSEY, MUSMANNO and ARNOLD, JJ.

*I. Herbert Rothenberg,* with him *Lemisch & Ginsburg,* for appellants.

*Richard H. Markowitz,* with him *Louis H. Wilderman,* for appellees.

OPINION BY MR. CHIEF JUSTICE HORACE STERN, June 27, 1955:

The question is whether the court below erred in refusing to enjoin the picketing of plaintiff's establishment by a labor union.

Plaintiff is a corporation which conducts several restaurants, one of which is located at 1302-04 Sansom Street, extending through to 1305-07 Walnut Street, in the City of Philadelphia. It employs some 90 persons. The Waiters & Waitresses Union, Local 301 A.F.L., commenced a campaign to organize plaintiff's employes and become their collective bargaining agent. Plaintiff allegedly tried to interfere with the rights of the employes to effect such organization and also discharged an employe, one Mary Greenwood, because, as the Union claimed, of her activities in its campaign. The Union filed charges with the State Labor Relations Board in regard to both those matters.

On March 26, 1952, the President of the Union, Ray Turchi, visited the restaurant and there engaged in an altercation with plaintiff's secretary and treasurer, Jacob Blum. Blum's version of the conversation was that Turchi said that Blum would be glad to put plaintiff's employes in the Union when he got through with him, that even if it took him 10 to 20 years he would picket and ruin plaintiff's restaurant, and that, when he got through, there would not be any Sansom House. Turchi denied this in part and claimed that Blum ordered him out and refused to discuss with him the question of reinstating Mrs. Greenwood. Be that as it may, the fact is that a whistle was then blown and the employes were called out on strike; some 13 of them responded and left the premises. The picketing by the Union thereupon began and has continued ever since, a period of over three years.

Acting on the complaint filed by the Union, the State Labor Relations Board entered a decree ordering plaintiff to cease and desist from interfering with its employes in the exercise of their rights to self-organization and collective bargaining, and from discriminating against its employes in regard to tenure of employment because of their union membership and activities. It ordered plaintiff to reinstate Mrs. Greenwood with back pay, and also to reinstate the employes who had gone out on strike. Plaintiff appealed from this order to the Court of Common Pleas and meanwhile, on October 13, 1952, offered unconditionally to reinstate Mrs. Greenwood, but the offer was not accepted either by her or the Union; none of the employes on strike requested reinstatement although plaintiff was willing at all times to comply with the order of the Board in that respect. The Court of Common Pleas found that Mrs. Greenwood had not been discharged because of her union activities and therefore reversed the order of the Board as to her case; this decision was affirmed on appeal to this Court (*Pennsylvania Labor Relations Board v. Sansom House Enterprises, Inc.*, 378 Pa. 385, 106 A. 2d 404). As to the Board's order to cease and desist from interfering with the rights of the employes to self-organization and collective bargaining, plaintiff, on October 8, 1953, filed with the Board an affidavit of compliance and duly posted the order of the Board as modified by the decision of the court. Nevertheless the picketing went on as before.

The present action in equity to enjoin the picketing was brought on December 2, 1953, by plaintiff, together with 70 of its employes, against the Union and its officers. Hearing having been had, the court concluded that plaintiff was not entitled to equitable relief against the defendants and dismissed the bill. Plaintiff appeals from that decision.

There is no question but that, where picketing is for an unlawful purpose, it is no longer protected as an exercise of the right of free speech and may properly be enjoined: *Wilbank v. Chester and Delaware Counties Bartenders, Hotel and Restaurant Employees Union,* 360 Pa. 48, 60 A. 2d 21; *Phillips v. United Brotherhood of Carpenters and Joiners of America,* 362 Pa. 78, 66 A. 2d 227; *Wortex Mills, Inc. v. Textile Workers Union of America, C.I.O.,* 369 Pa. 359, 85 A. 2d 851; *Baderak v. Building and Construction Trades Council,* 380 Pa. 477, 112 A. 2d 170. It therefore becomes necessary to consider the avowed purposes of the picketing in the present case.

The first of these is that the picketing was intended as a protest against the discharge of Mrs. Greenwood. As already stated, however, that protest has now no valid basis in view of the court's determination that her dismissal was not improper.

The second alleged reason for the picketing is that it was commenced because of plaintiff's interference with the rights of the employes to organize and bargain collectively. But the order made by the Pennsylvania Labor Relations Board in that matter was complied with more than a year and a half ago, thereby leaving no further ground for complaint in regard to it. It need scarcely be said that continuation of the picketing subsequent to that time cannot be justified as an act of retaliation or as punishment for whatever sin plaintiff may originally have committed.

So much for the two asserted reasons for the picketing thus discussed. Plaintiff several times called upon defendants to state whether they had any other grievances or demands which they wished to present and which, if there were any, it would be glad to discuss with them, but defendants have not complied with this request.

We come, then, to the objective upon which defendants principally rely for continuing to carry on the picketing, namely, to organize plaintiff's employes and induce them to join the Union. Such a purpose would undoubtedly be a legal and proper one because picketing which is conducted solely in order to persuade non-union employes of an establishment to join the union is constitutionally protected and cannot be enjoined: *Pappas v. Local Joint Executive Board,* 374 Pa. 34, 96 A. 2d 915; *Wilkes Sportswear, Inc. v. International Ladies' Garment Worker's Union,* 380 Pa. 164, 110 A. 2d 418. Plaintiff, however, contends that the picketing is really designed to force it to compel or require its employes to join the Union, and that the Union is engaged in a course of conduct intended or calculated to accomplish such coercion. Such picketing would be illegal and can and should be enjoined: Labor Anti-Injunction Act of June 2, 1937, P.L. 1198, section 4, as amended by the Act of June 9, 1939, P.L. 302; *Wilbank v. Chester and Delaware Counties Bartenders, Hotel and Restaurant Employees Union,* 360 Pa. 48, 60 A. 2d 21; *Phillips v. United Brotherhood of Carpenters and Joiners of America,* 362 Pa. 78, 66 A. 2d 227; *Baderak v. Building and Construction Trades Council,* 380 Pa. 477, 112 A. 2d 170. The court below found that the picketing was not for that purpose, but such a finding is merely an inference or deduction from the testimony and is therefore reviewable by this court: *Brooks v. Conston,* 356 Pa. 69, 51 A. 2d 684; *Crew v. Gallagher,* 358 Pa. 541, 58 A. 2d 179; *Heilig Bros. Co., Inc. v. Kohler,* 366 Pa. 72, 76 A. 2d 613. It is a finding with which we cannot agree because, in our opinion, the evidence speaks overwhelmingly to the contrary.

It is unfortunate that the learned chancellor did not make a finding of fact in regard to the conversation between Turchi and Blum, for certainly, if Blum's ver-

sion of what occurred is the correct one, it would go far toward proving that the real purpose of the picketing was to force plaintiff into establishing a closed union shop. Apart, however, from anything that Turchi may have said on that occasion, the actions of the pickets themselves speak louder than words and leave no room for doubt as to that question. The uncontradicted evidence is that there were sometimes as many as 18 or 20 of them on the Sansom Street entrance of the property and at least 6 or 8 on the Walnut Street entrance; that they moved in formations and jostled pedestrians and prospective customers from the sidewalk; that they blocked the entrances so as to make ingress and egress difficult; that they carried placards announcing that the employes were on strike and containing the legend: "We earnestly request our friends and sympathizers not to patronize;" that they threw leaflets into the restaurant urging the public to support them by not patronizing Sansom House Enterprises; that they requested people not to enter the restaurant and sometimes even tried to prevent them from doing so; that they told them the food was no good, that it was rotten, that it was poisonous, and that the service was "lousy"; that they shouted vile language into the restaurant and spat into the entry way; that they interfered with the delivery of supplies, making it necessary for plaintiff to bring in food by its own truck; that they carried on their picketing only at peak hours when business activities were at their height and customers most accessible instead of appealing to the employes when they could have been better contacted during more quiet periods; that, while they occasionally hurled profane language at the employes, they apparently made no serious attempt to communicate with them in order to discuss the question of their joining the Union. While some

of these actions were more or less sporadic they were, cumulatively, amply sufficient to establish a pattern that showed they were aimed at the employer, not at the employes. Defendants contend that they did not make any demand upon plaintiff to enter into a union agreement, but it was said in *Baderak v. Building and Construction Trades Council*, 380 Pa. 477, 483, 112 A. 2d 170, 173: "Appellants . . . take the position that, in order to show such primary or paramount purpose [of the picketing], there must be in effect a specific demand upon the employer by the union for recognition, and picketing because of a refusal by the employer. It is true that, in such a case, the inference of unlawful purpose is readily made. However, even in the absence of a direct demand upon the employer by the union, the purpose of the picketing may, nevertheless, be just as clear." And in that case it was found, on facts quite similar to those here present, that the purpose of the picketing was clearly that of coercing the employer. The effort of defendants in the present case to "break" plaintiff has been so remorselessly pressed that, according to its testimony, it has suffered an annual drop in receipts in its business from about $700,000 to $350,000.

The court below was of opinion that plaintiff did not come into equity with clean hands because of its having interfered with the organizational activities of the Union previous to March 26, 1952, when the picketing began. As already stated, however, plaintiff had admittedly undone any wrongs it may have committed years before and had "washed its hands" before the present action was instituted; it cannot therefore be barred on any such ground from obtaining equitable relief.

Being of opinion, for the reasons stated, that defendants' picketing has long been, and still is, illegal,

it becomes unnecessary to consider the question whether, even if its sole purpose were to organize plaintiff's employes, it should be allowed to continue indefinitely, more than three years having now gone by since its inception without its having succeeded during that time in gaining the adherence of the employes.

The decree is reversed and the record remanded to the court below with direction to grant the injunction prayed for; each of the parties to bear its own costs.

———

DISSENTING OPINION BY MR. JUSTICE MUSMANNO:

The record in this case covers some 450 pages. The Chancellor who saw and heard the witnesses made the following Findings of Fact: "1. Defendants' picketing is not for the purpose of coercing the plaintiff corporation to compel its employees to join the defendant unions. 2. The picketing by the defendants or members of the defendant unions was not accompanied by such violence or threats of violence as to warrant injunctive relief. 3. None of the defendants used force or threatened force such as would or did coerce the individual plaintiffs to join the defendant unions nor was any such force or threat of force used as would intimidate a person of average firmness. 4. The plaintiff corporation, because of its original interference with defendants' efforts to organize the employees does not come into court with clean hands."

These findings were confirmed by the Court en banc. The situation at the Sansom House has been unquestionably a distressing one, but I believe that the Majority in describing it in the Majority Opinion has painted a picture that goes beyond the frame of the testimony. For instance, the Majority says: "The *uncontradicted* evidence is that there were sometimes as

many as 18 or 20 of them [pickets] on the Sansom Street entrance of the property and at least 6 or 8 on the Walnut Street entrance." But some of this testimony *has* been contradicted by plaintiff witnesses themselves. Eugene M. Martin, a customer of the Sansom restaurant, testified: "Q. Where was the picket line with respect to the entrance of the restaurant? A. Well, it was in *front of the entrance on Sansom*. They were walking back and forth. Q. Do you now recall approximately how many pickets were in the line? A. That would be hard to say. I mean I would say maybe *five* or *six* anyhow." *

Harry Webster, an employe at Sansom House, testified: "Q. Where did you see the pickets, on what street were they? A. Sansom Street side, right at the door as I go out. Right on the Sansom Street side as I go out the door. Take about two steps out of the door and they would be parading up and down. Q. What time do you come to work? A. I come in at noon. Q. Are the pickets there when you come in? A. Sometimes they are, *sometimes they aren't*. Q. *So you don't see them there every day?* A. *No, I don't.*"

Edward Koziol, another employe, testified: "Q. Did they picket every day or only intermittently? A. Well, they picket almost every day, as far as I have noticed. In the afternoons I don't see them around. . . Q. Regularly? A. I would say pretty regularly; *only Walnut Street, at times I don't see pickets there,* but Sansom Street always. I manage to be on both sides and I do observe."

This same witness testified that the pickets never molested the employes in any way: "Q. Did you see or hear the pickets, or any one on the picket line, do or say anything untoward to the help? A. No, I

---

* Italics throughout, mine.

486

haven't myself." Further: "Q. Do you have any difficulty in getting through the picket line? A. No, I haven't. Q. Was anything ever said to you? A. *Nothing, absolutely nothing.*"

Myrtle Hess, a waitress employed at the Sansom House for seven and a half years, testified: "Q. You have been employed continuously from the time of the strike to the present, haven't you? A. Yes, sir. Q. And you are still employed there? A. Yes, sir. Q. And you wish, of course, to continue working? A. Yes, sir. Q. Have you had any experience with the pickets or anyone on the picket line? A. *No, the picket line hasn't bothered me one bit.*"

The Majority has referred to derogatory utterances made against the plaintiff's restaurant but the record shows that some of these denunciations occurred at union meetings and not at the restaurant.

As recently as 1951, this Court said in *Payne v. Winters*, 366 Pa. 299, 301: "Findings of a chancellor affirmed by the court en banc will be disturbed on appeal only where not supported by the evidence or where arbitrarily or capriciously made."

It is not evident that the learned and experienced Chancellor in the Court below made arbitrary or capricious findings.