Navios Corporation, Appellant, *v.* National Maritime Union of America.

Argued November 28, 1960.   Before JONES, C. J., BELL, MUSMANNO, JONES, COHEN, BOK and EAGEN, JJ.

326

*Samuel B. Fortenbaugh, Jr.,* with him *Herbert G. Schick,* and *Clark, Ladner, Fortenbaugh & Young,* for appellants.

*Herbert Brownell,* with him *Breck P. McAllister,* of the New York Bar, and *Earle K. Shawe,* with him *Sidney J. Barban,* of the Maryland Bar, for appellant.

*Nathan I. Posner,* with him *Israel Packel, Jay G. Ochroch,* and *Fox, Rothschild, O'Brien & Frankel,* for intervening appellant.

*Abraham E. Freedman,* with him *Marvin I. Barish,* and *Freedman, Landy & Lorry,* for appellees.

*Robert M. Landis,* and *Barnes, Dechert, Price, Myers & Rhoads,* for interested parties, under Rule 46.

OPINION BY MR. CHIEF JUSTICE JONES, December 15, 1960:

These appeals arise out of suits instituted by the plaintiffs seeking to enjoin the defendant unions and certain of their officers from picketing or in any other manner interfering with the unloading and servicing, at the Port of Philadelphia, of a ship flying a Liberian "flag of convenience."

The matter first came before the court below on the plaintiffs' motions for a preliminary injunction. After

a full hearing, the learned chancellor refused a preliminary injunction and contemporaneously entered decrees nisi dismissing the complaints, to which exceptions were subsequently filed and still remain undisposed of. Accordingly, final decrees have not been entered. The present appeals were promptly taken by the plaintiffs, pursuant to Section 15 of the Labor Anti-Injunction Act of June 2, 1937, P. L. 1198, 43 PS §206o, from the court's refusal of a preliminary injunction; and upon application of counsel, we forthwith advanced the appeals for argument, as contemplated by the Act.

The fundamental basis for the chancellor's action in denying the plaintiffs injunctive relief is that exclusive jurisdiction of the subject matter of the dispute is vested in the National Labor Relations Board. Whether that is so, under the facts of the case, is the legal problem to which we shall now address ourselves.

The plaintiffs, Universe Tankships, Inc., and Navios Corporation, are respectively the owner and time charterer of a bulk cargo vessel, the S.S. Ore Monarch, which transports iron ore from Puerto Ordaz, Venezuela, to the Fairless Works of the United States Steel Corporation at Morrisville, Pennsylvania. Because of the limited depth of the Delaware River, above Philadelphia, which the vessel necessarily must ply in order to reach Morrisville, she unloads a portion of her cargo at Philadelphia to lessen her draft before attempting to proceed upstream for delivery of the balance of the cargo at Morrisville. The S.S. Ore Monarch arrived at Philadelphia on October 21, 1960, laden with a cargo of iron ore from Puerto Ordaz for the United States Steel Corporation at Morrisville and was berthed at Pier 122 South on the Delaware River at Philadelphia for the partial unloading operation above mentioned.

All of the S.S. Ore Monarch's crew of forty-eight men are, with three exceptions, aliens and all, except

for the captain and chief engineer, are members of the Global Seamen's Union, an unincorporated association registered in the Cayman Islands, British West Indies, with which organization Universe Tankships, Inc., the owner of the vessel, has an existing labor agreement.

On October 26, 1960, Universe Tankships, Inc., and Navios Corporation filed complaints in the Court of Common Pleas of Philadelphia County against the National Maritime Union of America, the Seafarers' International Union of North America, the International Maritime Workers' Union, the International Longshoremen's Association, Local 1291, and certain officers of these unions for a temporary and, thereafter, a permanent injunction restraining the defendants from causing the S.S. Ore Monarch to be picketed or in any way interfering with the operation, management, internal economy and affairs of the S.S. Ore Monarch or any vessel owned or chartered by the plaintiffs; or in any manner inducing others to refuse to service such vessels. The plaintiffs also demanded damages.

The complaints alleged, inter alia, that, at or about the time that the S.S. Ore Monarch berthed at Pier 122 South, the defendants caused two persons to picket in front of the entrance to the pier carrying signs bearing the legend, "AMERICAN MARITIME UNIONS PROTEST UNFAIR LABOR PRACTICES OF 'ORE MONARCH'", and also caused a small boat carrying pickets with similar signs to cruise in the vicinity of the S.S. Ore Monarch, the picketing activity having continued up to the institution of the suits; that the defendants caused the pickets to prevent, or attempt to prevent, deliveries of supplies and victuals to the S.S. Ore Monarch by threats of force and intimidation to drivers of trucks undertaking to make such deliveries; that at approximately 8 p.m. on October 21, 1960, while the S.S. Ore Monarch was discharging her cargo, two agents of the

International Longshoremen's Association, Local 1291, boarded the S.S. Ore Monarch and ordered members of Local 1291, then working at the hatches of the ship, to cease working, the orders being promptly obeyed; that the unloading operations have not been resumed since that time; that the purpose of the above mentioned and similar actions of the defendants is to procure the breach of the labor agreement existing between Universe Tankships, Inc., and Global Seamen's Union, and to coerce Universe Tankships, Inc., to compel or require the members of its ship's crew to join the International Maritime Workers' Union; that the aforesaid actions of the defendants have prevented and are preventing the unloading, bunkering and victualling of the S.S. Ore Monarch, thereby causing the plaintiffs to suffer irreparable injury.

In the course of the hearings, the court granted Global Seamen's Union leave to intervene as a party plaintiff; and on November 4, 1960, the intervenor filed its separate complaint alleging substantially the same facts as the complaints filed by Universe Tankships, Inc., and Navios Corporation. Global's complaint asked, in addition, that the defendants be enjoined from inducing members of Global Seamen's Union from disavowing their relationship therewith and from compelling the employers of the S.S. Ore Monarch's crew to breach their contract with Global Seamen's Union and from entering into a contract with Universe Tankships, Inc., while the latter's contract with Global Seamen's Union endured. Otherwise, Global's complaint sought the same injunctive relief as was prayed for by Universe Tankships, Inc. Global did not, however, demand damages.

The facts adduced at the hearings in the court below further disclosed that the S.S. Ore Monarch was built in 1956 at Kure City, Japan, and was registered in New York on January 9, 1957, as a Liberian vessel,

which, however, has never been to Liberia. Nor has the ship ever been registered by any other country or flown any other flag than that of Liberia.

Universe Tankships, Inc., is a Liberian corporation, wholly owned by Oceanic Tankships, S. A., a Panamanian corporation, which, in turn, is wholly owned by D. K. Ludwig and W. W. Wagner, both of whom are American citizens.

Navios Corporation is a Liberian corportion, wholly owned by Navigen Corporation, a Liberian corporation also, which, in turn, is wholly owned by the United States Steel Corporation, and is registered in the Bahama Islands with its home office in Nassau.

The Cayman Islands are a British possession located approximately 250 miles south of Cuba in the British West Indies. Their population is between six and seven thousand inhabitants.

Global Seamen's Union was registered in the Cayman Islands on June 1, 1959, under the provisions of Trade Union Law 3 of 1952. Apparently it is the only union that has ever been registered in the Cayman Islands. The registration took place when a man who said that he was the Secretary-Treasurer of the Global Seamen's Union submitted a list of officers of the Union and the signatures of 15 or 20 men whom he said were its members. No official investigation of the union was made prior to its being admitted to registration in the Cayman Islands, whose registrar of trade unions testified that company domination does not disqualify a union from registering in the Cayman Islands. There is no record of any activity on the part of the union prior to its registration.

The S.S. Ore Monarch's articles of agreement with the members of its crew require all such as are eligible to join the Global Seamen's Union within thirty days after signing the articles.

On January 5, 1960, the Secretary of Universe Tankships, Inc., sent to the captain of the S.S. Ore Monarch a letter cautioning the members of the crew not to join any American unions and to abide by the contract between Global Scamen's Union and Universe Tankships, Inc. The captain was instructed to read the letter aloud to his unlicensed men at his first opportunity outside the territorial waters of the United States and, that, he did.

The time charter between Universe Tankships, Inc. and Navios Corporation is for a term of seven years, calculated from the time of the vessel's delivery at Puerto Ordaz, Venezuela, after having been released from the builder's yard in Japan. The charter provides that all differences or disputes with respect to performance and construction of the charter "shall be determined at the port of New York in accordance with the laws of the United States." Another clause of the charter provides that "All bills of lading, receipts or other shipping documents issued hereunder shall contain an appropriate Clause Paramount substantially in the following form: 'This bill of lading or contract of carriage shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the United States . . . .' " Payments due under the charter are to be made in United States currency and the ship is to be redelivered, unless otherwise mutually agreed, "at the last port of discharge which shall be on the U. S. Atlantic or Gulf Coast."

No evidence was introduced that the picketing was otherwise than peaceful or that it was accompanied by any violence whatsoever. The chancellor's finding to such effect, amply supported as it is by the record, must be taken on these appeals as an established fact.

If, as the court below held, this case involves a labor dispute within the jurisdiction of the National Labor Relations Board, then the picketing and other ac-

tivities of the defendants are either protected by Section 7 of the National Labor Relations Act of July 5, 1935, c. 372, 49 Stat. 449, as amended, 29 U.S.C.A. §157, or constitute an unfair labor practice under the standards of Section 8(b) of the same statute.

In *San Diego Building Trades Council v. Garmon*, 359 U. S. 236, 245 (1959), the United States Supreme Court declared that, "When an activity is arguably subject to §7 or §8 of the [National Labor Relations] Act, the States as well as the federal courts must defer to the exclusive competence of the National Labor Relations Board if the danger of state interference with national policy is to be averted."

It seems abundantly plain that, on the rationale to be deduced from Supreme Court decisions in cognate relation, the activity of the defendants in the instant case is, at least, *arguably* subject to Sections 7 or 8 of the National Labor Relations Act, and that accordingly requires us to "defer to the exclusive competence of the National Labor Relations Board" over the subject matter.

The appellants argue, however, that the picketing and other activities of the defendants involve an interference with the internal economy of a foreign ship and its foreign workers within the restrictive scope of the decision in *Benz v. Compania Naviera Hidalgo, S. A.,* 353 U. S. 138 (1957). We think the two cases are clearly distinguishable on their material facts.

In the *Benz* case a Liberian ship berthed at Portland, Oregon, for repairs, the loading of a cargo of wheat and the completion of an insurance survey. The crew was composed entirely of nationals of countries other than the United States, principally Germany and Great Britain. The crew members had agreed to serve on a voyage originating at Bremen, Germany, for a period of two years, or until the vessel returned to a European port. They had signed on under a British

form of articles of agreement which was opened at Bremen. The members of the crew went on strike, while at Portland, demanding that their term of service be reduced, their wages increased, and more favorable conditions of employment established. To voice their grievances, they picketed the vessel. Six days later they designated the Sailor's Union of the Pacific, an American union, as their collective bargaining representative. The striking crew, or others acting for them, continued the picketing for almost a month. The day after the crew withdrew its picket line, the Sailors' Union of the Pacific began picketing the ship. It was enjoined by the United States District Court after the shipowner filed suit for an injunction and damages. Subsequently, two other American unions picketed the ship and, in turn, were enjoined by the court.

At the trial of the *Benz* case, the District Court found, as stated in the opinion for the Supreme Court at page 141, "that the purpose of the picketing 'was to compel the [shipowner] to re-employ' the striking members of the crew for a shorter term and at more favorable wage rates and conditions than those agreed upon in the articles." In holding that the National Labor Relations Board did not have jurisdiction of this dispute, the Supreme Court said (page 142) : "It should be noted at the outset that the dispute from which these actions sprang arose on a foreign vessel. It was between a foreign employer and a foreign crew operating under an agreement made abroad under the laws of another nation. *The only American connection was that the controversy erupted while the ship was transiently in a United States port and American labor unions participated in its picketing."* (Emphasis supplied.)

The facts of the instant case, as we have hereinbefore recited them, reveal many and vital American connections involved in the controversy and not merely

that it "erupted while the ship was transiently in a United States port and American labor unions participated in its picketing." The case of *Marine Cooks & Stewards, AFL v. Panama Steamship Co., Ltd.*, 362 U. S. 365 (1960), presents a factual situation much more analogous to the present than does the *Benz* case.

In the *Marine Cooks* case, supra, the owner, the time charterer and the master of a Liberian registered vessel brought suit in a United States District Court against Marine Cooks & Stewards, AFL, inter alia, asking that the union and its members be enjoined from picketing the ship in American waters and from threatening to picket shore consignees of the ship's cargo should they accept delivery thereof. The Supreme Court stated the facts as follows (pp. 367-68) : "The S.S. NIKOLOS is owned by a Liberian corporation, was time-chartered for this trip by another Liberian corporation, and all members of its crew were aliens working under employment contracts made outside this country. There was no labor dispute between the ship's employees and the ship. The NIKOLOS picked up a cargo of salt in Mexico and carried it to the harbor of the port of Tacoma, Washington, for delivery to an American consignee there. After the ship entered the Tacoma harbor it was met by the [American] union's boat which began to circle around the NIKOLOS displaying signs marked 'PICKET BOAT.' Later an additional sign was put on the boat reading: 'AFL-CIO seamen protest loss of their livelihood to foreign flagships with substandard wages or substandard conditions.' The union threatened to extend its picketing to the consignee of the salt should an attempt be made to berth and unload that cargo. Although the picketing was peaceful and there was no fraud, the result was that the ship could not deliver its cargo."

The District Court issued a temporary injunction, which was affirmed by the United States Court of Ap-

peals for the Ninth Circuit, in reliance almost entirely upon *Benz v. Compania Naviera Hidalgo,* supra. The Supreme Court reversed and held that the Norris-La-Guardia Act[1] deprived the District Court of jurisdiction to issue the injunction under the circumstances shown, saying (page 370) : "It is difficult to see how this controversy could be thought to spring from anything except one 'concerning terms or conditions of employment,' and hence a labor dispute within the meaning of the Norris-LaGuardia Act. The protest stated by the pickets concerned 'substandard wages or substandard conditions.' The controversy does involve, as the Act requires, 'persons who are engaged in the same industry, trade, craft, or occupation.' And it is immaterial under the Act that the unions and the ship and the consignees did not 'stand in the proximate relation of employer and employee.' This case clearly does grow out of a labor dispute within the meaning of the Norris-LaGuardia Act." (Footnotes omitted.)

The National Labor Relations Act defines "labor dispute" as follows: "The term 'labor dispute' includes any controversy concerning terms, tenure or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment, regardless of whether the disputants stand in the proximate relation of employer and employee."[2]

The definition of labor dispute in the National Labor Relations Act is identical with the definition of labor dispute in the Norris-LaGuardia Act,[3] except

---

[1] Act of March 23, 1932, c. 90, 47 Stat. 70, 29 U.S.C.A., §101 et seq.

[2] Act of July 5, 1935, c. 372, Section 2(9), 49 Stat. 449, as amended, 29 U.S.C.A., §152(9).

[3] Section 13(c), 29 U.S.C.A., §113(c).

that the latter Act does not include the word "tenure" and uses the conjunctive phrase, "whether or not", instead of the more simple "whether." It follows, therefore, that if the facts of a case constitute a labor dispute within the meaning of the Norris-LaGuardia Act, they also constitute a labor dispute within the meaning of the National Labor Relations Act. Because the facts in the instant case are in all material respects similar to the facts in *Marine Cooks & Stewards, AFL v. Panama Steamship Co., Ltd.,* supra, it necessarily follows that this case involves a labor dispute within the meaning of the National Labor Relations Act.

In the *Marine Cooks & Stewards* case, the Supreme Court distinguished the *Benz* case as follows in footnote 12 at page 371: "Unlike the situation in the *Benz* case, in which American unions to which the foreign seamen did not belong picketed the foreign ship in sympathy with the strike of the foreign seamen aboard, the union members here were not interested in the internal economy of the ship, but rather were interested in preserving job opportunities for themselves in this country. They were picketing on their own behalf, not on behalf of the foreign employees as in *Benz*. *Though the employer here was foreign, the dispute was domestic.*" (Emphasis supplied.)

On similar facts in the instant case, then, we have a labor dispute within the meaning of the National Labor Relations Act which is domestic. It is all the more domestic in view of the many American connections revealed by the evidence taken in the court below. Because the present case involves a domestic labor dispute which affects commerce between a foreign country and a State, the complained of activity of the defendants is arguably subject to Sections 7 or 8 of the National Labor Relations Act. The National Labor Relations Board, therefore, has exclusive primary jurisdiction of the dispute.

This conclusion is confirmed by the fact that in *Peninsular & Occidental S. S. Co.*, 42 LRRM 1113 (1958), decided subsequent to the *Benz* case, the National Labor Relations Board took jurisdiction of a representation proceeding involving two ships registered in Liberia, owned by one Liberian corporation, and time chartered by another Liberian corporation. The Liberian corporation which owned the ships was wholly owned by an American corporation. The Board said, in its ruling, that ". . . the Florida and Southern Cross may not properly be considered for jurisdictional purposes as foreign vessels. To be sure, they are nominally owned by Liberian corporations which pay a tonnage tax upon the ships to the government of Liberia and are registered under the laws of that nation. However, the ships have never been in Liberian waters and are under the complete operational control of a domestic corporation." Neither should it make any difference whether a foreign registered ship is under the control of a domestic corporation or of individual United States citizens, as in the present case.

In *Eastern Shipping Corp.*, 44 LRRM 1571 (1959), which involved a foreign owned ship registered in Panama, with a foreign crew, and with its home port in Panama, the National Labor Relations Board reversed the regional director's dismissal of a representation petition filed by the Seafarers International Union AFL-CIO. The regional director had relied upon the *Benz* case.

In *Bartholomew v. Universe Tankships, Inc.*, 263 F. 2d 437 (2nd Cir., 1959), the United States Court of Appeals for the Second Circuit, in a Jones Act case where the injured seaman was a citizen of the British West Indies, affirmed a judgment against, significantly, the same shipowner as is involved in the instant case. The federal court did not hesitate to look behind the foreign flag which the shipowner raised in an at-

tempt to shield itself from liability, saying that, "Although appellant contends otherwise, the practice in this type of case of looking through the facade of foreign registration and incorporation to the American ownership behind it is now well established. Gerradin v. United Fruit Co., 2 Cir., 1932, 60 F. 2d 927, certiorari denied 287 U. S. 642, 53 S. Ct. 92, 77 L. Ed. 556; Carroll v. United States, 2 Cir., 1943, 133 F. 2d 690; Zielinski v. Empresa Hondurena de Vapores, D.C.S.D.N.Y. 1953, 113 F. Supp. 93; Torgersen v. Hutton, 2nd Dept. 1934, 243 App. Div. 31, 276 N.Y.S. 348, affirmed, 1935, 267 N.Y. 535, 196 N.E. 566, certiorari denied, 1935, 296 U. S. 602, 56 S. Ct. 118, 80 L. Ed. 426. This is essential unless the purposes of the Jones Act are to be frustrated by American shipowners intent upon evading their obligations under the law by the simple expedient of incorporating in a foreign country and registering their vessels under a foreign flag. See Lauritzen, 345 U. S. at page 587, 73 S. Ct. at page 930. In the case now before us appellant has taken the trouble to insert an additional nominal foreign corporation between the flag and the true beneficial ownership of the vessel. But we have little difficulty in brushing all this aside when considering the applicability vel non of the Jones Act. Complicating the mechanics of evasive schemes cannot serve to make them more effective. What we now do is not to disregard the corporate entity to impose liability on the stockholders, but rather to consider a foreign corporation as if it were an American corporation pursuant to the liberal policies of a regulatory act. See Zielinski v. Empresa Hondurena de Vapores, supra, 113 F. Supp. at page 95." (Footnote omitted.)

The appellants point out that it is the policy of the United States Government to recognize a vessel's foreign "flag of convenience." Since, however, this policy does not deter the federal courts from looking behind

such flags in cases involving federal regulatory statutes like the Jones Act, for instance, it may reasonably be inferred that neither should it deter the National Labor Relations Board from looking behind such flags in cases involving the National Labor Relations Act. The above cited rulings of the National Labor Relations Board accord with this conclusion.

In our opinion, exclusive primary jurisdiction of the dispute involved in these appeals is in the National Labor Relations Board.

The orders of the court below, denying the plaintiffs' respective motions for preliminary injunctions in the several suits, are affirmed and the complaints dismissed at the appellants' costs.

Mr. Justice BENJAMIN R. JONES dissents.

---

DISSENTING OPINION BY MR. JUSTICE BELL, December 16, 1960:

There are two important questions involved: (1) has a State Court of Equity jurisdiction to enjoin the picketing and the interference with unloading and servicing of the Liberian ship S.S. Ore Monarch; and (2) if so, should it do so? I would answer both questions in the affirmative. The highlights of the facts (which are set forth in the majority opinion in detail) are:

Navios Corporation, the Appellant in No. 147, is a *Liberian corporation* having its only office or place of business at Nassau, Bahamas, *British West Indies.* This corporation is in the business of transporting bulk commodities in worldwide service and for this purpose operates 37 chartered vessels of which the S.S. Ore Monarch, which is involved in these appeals, is one.

Universe Tankships, Inc., the Appellant in No. 148 is the owner of the Monarch which it charters to

Navios Corporation. Universe owns and operates a fleet of ocean-going bulk cargo vessels in worldwide service. It is a foreign corporation which is *incorporated in Liberia*,\* with its principal office in Hamilton, Bermuda, British West Indies, *and has an existing labor agreement with the Global Seamen's Union.* This labor agreement was executed at *Port-of-Spain, Trinidad,* on January 6, 1960. The Articles of Agreement between Master and crew of the Monarch provide pertinently: "Between Master and Seamen in the *Merchant Service of Liberia.* . . . It is agreed that all of the rights of the parties hereto without limitation shall be governed *by the Laws of the Republic of Liberia.* . . . Any disputes arising between the Master or owner and members of the crew regarding this agreement, *wages and/or working conditions* is to be settled by the proper competent representative of LIBERIA."

Plaintiffs' vessel the Monarch, was built in *Japan,* registered in *Liberia and flies the Liberian flag.* On this voyage it was carrying a load of Venezuelan ore from Puerto Ordaz, Venezuela, to the Fairless Works of the United States Steel Corporation at Morrisville, Pennsylvania.\*\*  Because of the limited depth of the Delaware River the Monarch docked at Philadelphia to unload a part of her cargo and consequently is temporarily in American waters. All of the Monarch's crew of 48 men are, with three exceptions, nationals and residents of foreign countries, and all except for

---

\* Universe Tankships, Inc., is wholly owned by Oceanic Tankships, S. A., a Panamanian corporation, which in turn is wholly owned by two individuals, both of whom are American citizens. Navios Corporation is wholly owned by Navigen Corporation, which is in turn a wholly owned subsidiary of the United States Steel Corporation.

\*\* Since this vessel was registered, she has made various voyages between South American ports and ports in the United Kingdom and Canada, as well as the United States.

the Master and Chief Engineer, *are members of the Global Seamen's Union. The Global Seamen's Union is an unincorporated association,* registered in the Cayman Islands, *British West Indies.*

The defendant Unions, i.e., four American national and/or international unions, waited at Pier 122 South, Philadelphia, for the arrival of the Monarch. Pickets carried in front of the entrance to the pier, signs bearing the legend "American Maritime Union Protests Unfair Labor Practices of Owners of the Ore Monarch" and "American Maritime Union Protests Substandard Wages and Working Conditions on the Ore Monarch." The Unions also caused a small boat carrying pickets with similar signs to cruise in the vicinity of the Monarch. They also caused the pickets to prevent, or attempt to prevent, the unloading of ore and the delivery of supplies and victuals to the Monarch. Even more important, two agents of the defendant, the International Longshoremen's Association, boarded the Monarch and ordered the members of its Local to cease working, which orders were promptly obeyed. Perhaps most important of all, the Unions induced three hatchmen to leave the boat and depart with them, thereby paralyzing the unloading. It is as clear as crystal that the aforesaid actions by defendants were taken for the obvious fourfold purpose (1) to induce the members of the Global Seamen's Union to break their Union contract and (2) to induce the Monarch's seamen to enter into a contract with one of the defendants in breach of their present Union contract and (3) to coerce the employers, i.e., the owner and/or the charterer of the Monarch to enter or induce the seamen to enter into a contract with one of the defendants and (4) to prevent the unloading and servicing of the Monarch until their purposes and objectives are accomplished. The Global Seamen's Union intervened as a party plaintiff and vigorously attacked the actions of the

defendants and sought the same injunctive relief against the defendant Unions as was prayed for by Navios Corporation and Universe Tankships, Inc.

The lower Court refused an injunction and dismissed the complaint on the ground that the National Labor Relations Board had (primary) jurisdiction of this labor dispute and therefore the State Court lacked jurisdiction. This decision was today affirmed by this Court.

The National Labor Relations Act, as amended by the Labor Management Relations Act of 1947,* will be searched in vain for any language which would give the National Labor Relations Board jurisdiction under the aforesaid facts. The majority opinion is unable to quote or even point to any language of the Act in support of its interpretation. On the contrary, the purpose, the intent and the whole background of the Act is concerned with the industrial relationship between American workingmen and their employers—it was never intended to apply to foreign unions or to Union contracts made by foreigners with foreigners.

That the Labor Management Relations Act of 1947 does not apply to cases of this nature is demonstrated by *Benz et al. v. Compania Naviera Hidalgo, S. A.,* 353 U. S. 138 (1957). That case is directly in point** and governs this case. In that case the owner of a foreign vessel (1) was granted an injunction against peaceful picketing by seamen and by three American Unions, and (2) damages were assessed against the Unions, including the three American Unions which were doing the peaceful picketing. Six months after the vessel sailed, the injunction orders were vacated and were

---

* 61 Stat. 136, 29 U.S.C.A., §141.

** This case was decided by the U. S. District Court under Oregon law which is like Pennsylvania law and contains different provisions from the Norris-LaGuardia Act and other Federal Acts.

ordered dismissed as moot and hence the appeal of the Unions only involved the right to and the amount of damages. The Supreme Court affirmed the judgment of the Federal District Court (which applied Oregon law) and, we repeat, had awarded damages to the foreign shipowner against the American Labor Unions which had been peacefully picketing the ship. In the course of its opinion the Supreme Court said (pages 139-147):

"The S.S. Riviera on September 3, 1952, sailed into harbor at Portland, Oregon, for repairs, to load a cargo of wheat, and to complete an insurance survey. It was owned by respondent, a Panamanian corporation, and sailed under a Liberian flag. The crew was made up entirely of nationals of countries other than the United States, principally German and British. They had agreed to serve on a voyage originating at Bremen, Germany, for a period of two years, or until the vessel returned to a European port. A British form of articles of agreement was opened at Bremen. The conditions prescribed by the British Maritime Board were incorporated into the agreement, including wages and hours of employment, all of which were specifically set out. . . .

"On or about September 9, 1952, the members of the crew went on strike on board the vessel and refused to obey the orders of the Master. They demanded that their term of service be reduced, their wages be increased, and more favorable conditions of employment be granted. . . . On September 15, 1952, they had designated the Sailors' Union of the Pacific as their collective bargaining representative. The striking crew or others acting for them continued the picketing from September 26, 1952, until they withdrew the picket line on October 13, 1952. The Sailors' Union of the Pacific began picketing the Riviera on October 14 and continued to do so until restrained by an injunction

issued in an action for injunctive relief and damages filed against it and its principal representatives by the respondent. Two days later Local 90 of the National Organization of Masters, Mates and Pilots of America set up a picket line at the Riviera which was maintained until December 8, 1952. This picketing was stopped by a writ issued against that union and its representatives in the second action for injunction and damages filed by respondent and consolidated here. On December 10, 1952, another picket line was established at the vessel. It was maintained this time by the Atlantic and Gulf Coast District, S.I.U., until it too was enjoined on December 12 in a third action filed by the respondent in which the prayer likewise was for an injunction and damages. . . . All of the picketing was peaceful.

. . .

". . . The only American connection was that the controversy erupted while the ship was transiently in a United States port and American labor unions participated in its picketing.

"It is beyond question that a ship voluntarily entering the territorial limits of another country subjects itself to the laws and jurisdiction of that country. Wildenhus's Case, 120 U. S. 1 (1887). The exercise of that jurisdiction is not mandatory but discretionary. . . . It follows that if Congress had so chosen, it could have made the Act applicable to wage disputes arising on foreign vessels between nationals of other countries when the vessel comes within our territorial waters. The question here therefore narrows to one of intent of the Congress as to the coverage of the Act.

"The parties point to nothing in the Act itself or its legislative history that indicates in any way that the Congress intended to bring such disputes within the coverage of the Act. . . .

"Our study of the Act leaves us convinced that Congress did not fashion it to resolve labor disputes between nationals of other countries operating ships under foreign laws. The whole background of the Act is concerned with industrial strife between American employers and employees. In fact, no discussion in either House of Congress has been called to our attention from the thousands of pages of legislative history that indicates in the least that Congress intended the coverage of the Act to extend to circumstances such as those posed here. It appears not to have even occurred to those sponsoring the bill. The Report made to the House by its Committee on Education and Labor . . ., stated that 'the bill herewith reported has been formulated as a bill of rights both for American workingmen and for their employers.' The report declares further that because of the inadequacies of legislation 'the American workingman has been deprived of his dignity as an individual,' and that it is the purpose of the bill to correct these inadequacies. (Emphasis added.) H. R. Rep. No. 245, 80th Cong., 1st Sess. 4. What was said inescapably describes the boundaries of the Act as including only the workingmen of our own country and its possessions.

. . .

". . . Soon thereafter several proposals were made in Congress designed to extend the coverage of the Seamen's Act so as to prohibit advancements made by foreign vessels in foreign ports. A storm of diplomatic protest resulted. Great Britain, Italy, Sweden, Norway, Denmark, the Netherlands, Germany, and Canada all joined in vigorously denouncing the proposals. In each instance the bills died in Congress.

"And so here such a 'sweeping provision' as to foreign applicability was not specified in the Act. The seamen agreed in Germany to work on the foreign ship

under British articles. We cannot read into the Labor Management Relations Act an intent to change the contractual provisions made by these parties. For us to run interference in such a delicate field of international relations *there must be present the affirmative intention of the Congress clearly expressed.* It alone has the facilities necessary to make fairly such an important policy decision where the possibilities of international discord are so evident and retaliative action so certain. We, therefore, conclude that any such appeal should be directed to the Congress rather than the Courts."

In addition to the controlling Benz case, are there any persuasive or controlling reasons to indicate whether Congress did or did not intend the National Labor Relations Board to have jurisdiction of questions and matters such as are herein involved? The answer is: Yes, there are two—practicalities and treaties.

This case is not just a question of whether one or more American unions can tie up the Ore Monarch which carries Venezuelan ore from Venezuela and flies the Liberian flag. This case reduced to its basic essentials, affects British, French, and all foreign ships and all foreign commerce—the sellers, the buyers, the owners, the charterers, the shippers, the consignees, the railroads, the trucking industry and all other carriers. As a necessary consequence, it likewise affects American and foreign unions and businesses and the Government of the United States. Most important of all, it *directly* affects (a) our treaties with other nations, and (b) international trade, which our Federal Government is attempting to expand, and (c) our friendship with other countries.

From ancient times international trade has grown up like Topsy—first to promote prosperity and later to foster friendships throughout the world. In order to

maintain and protect trade between nationals of different countries and later international trade from banditry and conflicting national or domestic or group interests, certain protecting principles gradually took form. This form probably first appeared in the lawmerchant. The need for international understandings or agreements affecting trade on the waters of the deep became especially vital and necessary. Hence there gradually evolved the internationally recognized doctrine of freedom of the seas. This doctrine presented, from time to time, problems which were approached or decided differently by different Nations at different times to suit their particular interests at a particular time. If a variety of tests could be adopted with each Nation establishing or applying the test which it momentarily preferred, maritime trade would be stifled, if not paralyzed. Maritime and international trade could not and cannot wait until the stockholders or the holding companies or eventually the owner (as distinguished from the registered or record owner) can be ferreted out and/or determined by Court proceedings in one or in many Nations. Consequently Nations have sought a common sign which would be visible, and easily recognizable and understandable by everyone— the Flag. For these reasons the historic doctrine of the flag (of registry) has been internationally recognized for over a century:*Wildenhus' Case*, 120 U. S. 1; *United States v. Flores*, 289 U. S. 137; *Benz v. Compania Naviera Hidalgo, S. A.*, 353 U. S. 138; *Lauritzen v. Larsen*, 345 U. S. 571, 584; Article V of the Geneva Convention on the High Seas of 1958, which was ratified by the United States Senate on May 26, 1960; Constitution of the Maritime Safety Committee of the Inter-Governmental Maritime Consultive Organization, I C.J. Reports 1960, page 150. In an opinion in connection therewith rendered on June 8, 1960, the International Court of Justice recognized that the registry

and the flag of Liberia are entitled to the same national status which is accorded the registry and the flag of any other Nation. These are likewise the views of the Attorney General of the United States and of the Secretary of State of the United States and of the Secretary of Defense of the United States as presented to the National Labor Relations Board by the United States Intervener as Amicus Curiae in the very recent case of *West India Fruit and Steamship Co., Inc.,* and three unions.

Confronted with this historical background* and with the knowledge which every Congressman undoubtedly possesses—namely, that unless immediate and permanent relief were granted in this class of case, irreparable damage and disastrous international repercussions were inevitable—it is inconceivable to me, as it has been to the Attorney General and to the Secretary of State of the United States (see infra) that Congress intended to oust the historical jurisdiction of Courts of Equity in this maritime class of cases where damage is so obvious, so swift and so irreparable, and to vest jurisdiction as if it were a mere domestic matter or a domestic labor dispute in the tortoiselike processes of the National Labor Relations Board.**

---

* The enormous damage to plaintiffs and interveners which is mounting daily has necessitated this as well as the pertinent principles and authorities to be presented in capsule form.

** My sympathies are naturally entirely with American workers such as are represented by the defendant Unions, because they have become unemployed or are threatened with unemployment and distress by our National policy of more and more billions for economic non-military foreign aid. For years this economic foreign aid which has exceeded 30 billion dollars was both wise and necessary, but many non-communist Countries have, with the help of our enormous financial aid, recovered to such an extent that they are now flooding our Country with cheaply made foreign goods and creating vast unemployment. I am convinced that it would be far wiser to spend or give our money to distressed areas and dis-

The majority in order to find jurisdiction only in the National Labor Relations Board attempt to pierce the corporate veil of all the holding companies and find that the vessel, by virtue of the ultimate stock ownership, is owned by American citizens. In the first place, for reasons hereinabove set forth, this is irrelevant—in these cases they cannot tear the flag from the masthead. In the next place, it would avail them nothing because of our treaty with Liberia.

Article VI, Clause 2, of the Constitution of the United States proclaims that "all Treaties made . . . under the Authority of the United States, shall be the Supreme Law of the Land and the Judges in every State shall be bound thereby."

The nationality of the Ore Monarch is *Liberian*, and under the applicable treaty and the Constitution of the United States, as well as settled principles of International and Maritime Law, she must be treated as such. Article XV of the Treaty of Friendship, Commerce and Navigation of August 8, 1938* between the United States and the Republic of Liberia provides:

"Merchant vessels and other privately owned vessels *under the flag*** of either of the High Contracting Parties, and carrying the papers required by its na-

---

tressed and unemployed people in our Country. However, that policy is a matter for Congress and the President of the United States and not for Labor Unions, or Labor Relations Boards, or Courts.

* 54 Stat. 1739 (1939), TIAS No. 956. This same or a similar provision is also found in the Treaties of Friendship, Commerce and Navigation which the United States has entered into with the Federal Republic of Germany, 7 UST 1839, TIAS No. 3593 (October 29, 1954); Honduras, 45 Stat. 2618 (1928), TIAS No. 764 (December 7, 1927); Iran, 8 UST 899, TIAS No. 3853 (August 15, 1955); Japan, 4 UST 2063, TIAS No. 2863 (April 2, 1953); The Netherlands, 8 UST 2043, TIAS No. 3942 (March 27, 1956); and Nicaragua, 9 UST 449, TIAS No. 4024 (January 21, 1956).

** Italics throughout, ours.

tional laws in proof of nationality shall, *both within the territorial waters of the other* High Contracting Party and on the high seas, *be deemed to be the vessels of the Party whose flag is flown."*

As the Supreme Court of the United States stated in *Lauritzen v. Larsen,* 345 U. S. (supra), page 584 (1953) : ". . . the most venerable and universal rule of maritime law . . . is that which gives cardinal importance to the law of the flag. Each state under International Law may determine for itself the conditions on which it will grant its nationality to a merchant ship, thereby accepting responsibility for it and acquiring authority over it. Nationality is evidenced to the world by the ship's papers and *its flag. The United States has firmly and successfully maintained that the regularity and validity of a registration can be questioned only by the registering state."*

This principle was recognized long ago in *Wildenhus' Case,* 120 U. S. 1 (1887), and followed in *United States v. Flores,* 289 U. S. 137 (1933). In addition, Article V of the Geneva Convention on the High Seas of 1958 (which was ratified by the United States Senate on May 26, 1960) provides pertinently:

"1. Each State shall fix the conditions for the grant of its nationality to ships, for the registration of ships in its territory, and for the right to fly its flag. *Ships have the nationality of the State whose flag they are entitled to fly. . . .*

"2. Each State shall issue to ships to which it has granted the right to fly its flag documents to that effect."

And, in an advisory opinion, the International Court of Justice recognized that the registry and flag of Liberia are entitled to the same national status accorded the registry and flag of any other nation: Constitution of the Maritime Safety Committee of the In-

tergovernmental Maritime Consultive Organization, I C.J. Reports 1960, page 150.

As the Attorney General of the United States stated in his brief as Amicus Curiae before the National Labor Relations Board, in the matter of *West India Fruit and Steamship Company, Inc.*, supra: "Another consideration compelling the recognition of the international law principle that the nationality of a ship is determined by the flag she flies is the fact that the principle is incorporated in various treaties of the United States with other nations. Honduras and Liberia, nations whose flags are flown on ships involved in these proceedings, have treaties with the United States, providing in essence that vessels flying their flags and carrying papers as required by their laws in proof of nationality must be recognized by the United States as ships of the flag-flying country within the territorial waters of this country. These provisions, or comparable ones, are common to a number of Treaties of Friendship, Commerce and Navigation which the United States has entered into with other friendly foreign nations, such as The Netherlands, Nicaragua, Iran, the Federal Republic of Germany, and Japan.

. . .

"A refusal to treat merchant vessels flying the flag of Liberia and Honduras as vessels of those nations would be in direct conflict with our treaty obligations and would, as the Under Secretary of State has pointed out in his letter of October 27, 1960, to the Attorney General, create serious difficulties in our foreign relations not only with nations signatory to these treaties but with other nations, such as Panama, which would be entitled to interpret a refusal to recognize the flag of the ship as a violation of the rules of international law upon which there had been mutual reliance.

"The flag rule of international law accords all nations equal status without discrimination and the flags of small nations such as Honduras, Liberia and Panama are entitled to the same recognition as those of the flags of such great maritime nations as the United States, Britain, France, and Germany. . . .

"A general application of the Taft-Hartley Act to ships flying the flags of Liberia, Honduras, and Panama would have far-reaching effects upon the internal economy of the ships, would displace the labor relations policies of the flag states as well as labor unions organized under their laws and would prejudice the foreign relations of the United States with these independent nations. In such event the flag nations involved would consider assumption of jurisdiction by the Board to be an unwarranted intrusion into their own domestic matters.

"It is difficult to conceive of a greater prejudice to maritime commerce and the foreign relations of the United States than attempts of administrative agencies of the United States or its courts to distinguish between nationality flags upon the basis of the internal legislation of the flag state fixing the conditions for the grant of its flag or other comparable factors."

The Secretary of Defense by letter dated October 26, 1960 also requested the Attorney General to intervene in the cases pending before the National Labor Relations Board and point out to the Board the vital necessity of having "ships flying the flags of Liberia, Panama and Honduras . . . available for United States usage . . . during periods of national emergency" in accordance with agreements made by the United States with those countries. The Secretary of Defense said, inter alia: "In my considered judgment the subjection of these foreign flag vessels to the jurisdiction of the United States Labor Management Act would very likely have the effect of driving them to registration un-

der the flags of other nations . . . and under such registries these ships would no longer be available for the emergency use of the United States . . . with consequent loss of control over a vital resource by the United States in the event of a national emergency."

An analysis of *Marine Cooks and Stewards v. Panama Steamship Co.* and *San Diego Building Trades Council v. Garmon* and the other decisions of the Supreme Court upon which the majority relies will demonstrate that they are, because of their facts and/or a different Congressional Act, clearly distinguishable.

It is clear that the National Labor Relations Board does not have jurisdiction and that the Court of Common Pleas of Philadelphia (sitting in Equity) where the complaint was filed, does have jurisdiction. It is even clearer that the lower Court should enter the injunction prayed for. Even if the picketing in this case, in spite of taking the three hatchmen off the boat, is considered peaceful, the appellees (labor unions) continue under the delusion that *all peaceful* picketing is lawful. Of course that is not the law. It is well settled that a State Court may enjoin peaceful picketing if it is conducted in an unlawful manner, or if one of its objects is unlawful even though it is not the sole object: *International Brotherhood of Teamsters Union, Local 309 v. Hanke,* 339 U. S. 470; *Building Service Employees International Union, Local 262 v. Gazzam,* 339 U. S. 532; *Wilbank v. Chester & Delaware Counties Bartenders, Hotel & Restaurant Employees Union,* 360 Pa. 48, 50, 60 A. 2d 21, 22; *Phillips v. United Brotherhood of Carpenters and Joiners of America,* 362 Pa. 78, 82, 66 A. 2d 227, 228; *Wortex Mills, Inc. v. Textile Workers Union of America, C.I.O.,* 369 Pa. 359, 369, 85 A. 2d 851, 857; *Sansom House Enterprises, Inc. v. Waiters & Waitresses Union, Local 301, A.F.L.,* 382 Pa. 476, 480, 115 A. 2d 746, 748; *Anchorage, Inc. v. Waiters & Waitresses Union,* 383 Pa. 547, 119 A. 2d

199; *Garner v. Teamsters, Chauffeurs & Helpers, Local Union No. 776,* 373 Pa. 19, 22, 94 A. 2d 893, 895; *Baderak v. Building & Construction Trades Council,* 380 Pa. 477, 482, 112 A. 2d 170, 173; *West Penn Township School District v. International Brotherhood of Electrical Workers,* 396 Pa. 408, 145 A. 2d 258; *Northampton Area Joint School Authority v. Building & Construction Trades Council,* 396 Pa. 565, 152 A. 2d 688; Act of June 2, 1937, P. L. 1198, as amended by the Act of June 9, 1939, P. L. 302, §4(a), (b).

It is clear that defendants have violated (a) the fundamental law of the land as well as (b) the law of Pennsylvania, and (c) that their unlawful objects, conduct and activities have caused and are causing plaintiffs and buyers and carriers irreparable damage* and their conduct is in violation of our international treaties and will likely injure our friendly relationships with many other countries. In my judgment plaintiffs have made out a case clearly requiring the issuance of an appropriate injunction.

For each and all of the aforesaid reasons, I dissent.

---

* During the three weeks following October 21, 1960, twelve vessels flying a foreign flag have already been diverted from the Port of Philadelphia, resulting in a loss of approximately 405,000 tons of ore to this Port. The loss to the Port, to the shippers, the buyers, the railroads, and other carriers has not been estimated, but is obviously tremendous.